[No. A030558. First Dist., Div. Two. Dec. 4, 1987.]

WILLIAM DORN III, Plaintiff and Appellant, v.
RONALD MENDELZON et al., Defendants and Respondents.

■■■■■■■■■■■

## COUNSEL

George Holland and Holland, Sims & Cohen for Plaintiff and Appellant.

Leo J. O'Brien, Lawrence A. Margoles, Barfield, Dryden & Ruane, James J. Marchiano, James C. Martin, Joseph P. Mascovich and Crosby, Heafey, Roach & May for Defendants and Respondents.

## OPINION

McCARTY, J.*— Plaintiff-appellant William Dorn III, an orthopedic surgeon, brought an action for defamation against two hospitals and their administrators arising from the disclosure of evaluative information contained in plaintiff's personnel file. In this appeal from a summary judgment adverse to plaintiff, we consider the nature and extent of statutory privileges applicable to a hospital's communications regarding peer evaluations of a doctor's performance there, where such communications were made (1) to the Board of Medical Quality Assurance (BMQA) and (2) to another hospital which requested such information in order to aid in its consideration of whether to grant the doctor staff privileges.

### Factual Background

In the summer of 1976, plaintiff submitted separate applications for staff privileges as an orthopedic surgeon at Broadway Hospital (Broadway) and Vallejo General Hospital (Vallejo General), both of which were located in the City of Vallejo. Plaintiff was subsequently permitted to perform surgery while being "proctored" at both hospitals. Proctoring is a method by which

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

experienced practitioners at a hospital monitor the progress and evaluate the skills and knowledge of new staff doctors.

In a letter addressed to plaintiff dated November 22, 1976, Dr. Charles Glover, chairman of Broadway's credentials committee stated that, based on its review of four recent proctor reports, the credentials committee would recommend to the hospital's executive committee that plaintiff only be allowed to perform surgery "with the assistance of a qualified orthopedic surgeon with staff privileges in this hospital. [¶] This recommendation will be in effect until final decision is reached at the next Executive Committee meeting, December 13, 1976. You will be notified of their decision." Two weeks after Dr. Glover's letter was sent, plaintiff notified Broadway that, effective immediately, he was withdrawing his application for privileges and no longer wished to perform surgery there. In opposition to the summary judgment motions, plaintiff denied receiving Dr. Glover's letter, claimed he had no knowledge of any disciplinary action taken against him by Broadway until three years later, and asserted that he resigned solely for economic and ethical reasons. As we shall see, plaintiff's assertions, even if true, are irrelevant to the controlling issues of law.

Shortly after plaintiff's resignation, Ronald D. Mendelzon became chief administrator at Broadway. Believing that he was required by law, and specifically Business and Professions Code section 805, to report plaintiff's situation to BMQA, Mendelzon spoke with Broadway staff personnel, reviewed correspondence including the two letters just mentioned, and completed a form entitled "Disciplinary Report." The report (sometimes hereafter referred to as the BMQA report) recited the restriction on plaintiff's staff privileges as noted in Dr. Glover's letter and concluded that "[u]pon notification of the above, Dr. Dorn withdrew his application for privileges at Broadway Hospital 12-6-76." Mendelzon signed the report as "Chief Administrator or Executive Officer" and mailed it to BMQA on January 25, 1977.[1]

---

[1] As of January 1, 1977, Business and Professions Code section 805 provided, in pertinent part: "The chief administrator or executive officer of any county hospital or county medical facility *or . . .* health facility . . . shall report to the agency which issued the license, certificate, or similar authority when any licensed physician and surgeon . . . is denied staff privileges, removed from the medical staff of such institution, or if his staff privileges are restricted for a cumulative total of 45 days in any calendar year, for any medical disciplinary cause or reason. Such report shall be made within 20 working days following such removal or restriction, shall be certified as true and correct by the chief administrator or other executive officer, and shall contain a statement detailing the nature of the action, its date and all of the reasons for, and circumstances surrounding, such action. If the removal or restriction is by resignation or by voluntary action, the report shall state whether the resignation was requested or bargained for." (Stats. 1976, ch. 1185, § 2, p. 5291, italics added.) In 1979, the following language was added: "Failure to make a report pursuant to this section shall be a

On June 6, 1977, Mendelzon received a letter from BMQA. The letter acknowledged that section 805 required Mendelzon to report "any restrictive action taken with respect to a physician's staff privileges," but noted that after a full investigation of plaintiff, "the Board was unable to confirm any violation of the Medical Practice Act."

On April 12, 1979, plaintiff filed an application for staff privileges at Centinela Hospital Medical Center [Centinela] in Southern California. In the course of processing the application, Centinela learned of the BMQA report pertaining to the restriction on plaintiff's privileges. Consequently, on March 14, 1980, Centinela wrote a letter of inquiry to Jack Manley, administrator of Vallejo General, which by that time had purchased Broadway's assets. The letter noted that, according to the BMQA report, plaintiff's privileges were restricted on the basis of "proctor reports." Centinela therefore requested that Manley provide "a written summary or copy of those proctor reports and the reasons for his restrictions . . . ."

Upon receipt of the letter, Manley reviewed plaintiff's files at both Broadway and Vallejo General. He then wrote a confidential reply letter (sometimes hereafter referred to as the Manley letter), stating that a review of plaintiff's proctor reports indicated "lack of follow-up visits to in-house patients post-operatively, failure to conform to the utilization plan for the hospital, failure to procure MediCal authorization, and unacceptable technical skill during certain surgical procedures. Other reports indicated adequate care." After receipt of this information, Centinela increased the number of cases on which plaintiff had to be "proctored" in connection with his application; ultimately, however, plaintiff was granted staff privileges at Centinela.

### Procedural Background

Plaintiff's fourth amended complaint for "Libel and Slander, Intentional Infliction of Emotional Distress, Negligent Hiring and Supervision" names Mendelzon, Broadway, Vallejo General and Manley as defendants. Broadway and Vallejo General were made party-defendants on the apparent theory that they were vicariously liable for the acts of Mendelzon and Manley respectively, except for one cause of action which alleges that Vallejo General negligently hired and supervised Manley, proximately resulting in his having written the 1980 letter. Although the complaint sets forth 51 purported causes of action and consists of 200 charging paragraphs, it is clear that it is based squarely upon two alleged tortious acts: Mendelzon's filing

---

misdemeanor punishable by a fine of not less than one hundred dollars ($100) nor more than six hundred dollars ($600)." (Stats. 1979, ch. 602, § 1, p. 1875.)

of the BMQA report in 1977 and Manley's letter to Centinela in 1980. Each of these communications was alleged to have been "false, malicious and libelous and made with the intent of injuring plaintiff in his high regard and respect in his profession . . . ." Plaintiff sought $4 million in general damages and $5 million in punitive damages.

After substantial discovery was undertaken, Manley and Vallejo General moved for summary judgment, based upon a host of asserted privileges. The superior court granted the motion, finding that the Manley letter was protected by the qualified privileges set forth in Civil Code sections 43.8 and 47, subdivision 3 (hereafter section 47(3)),[2] and that plaintiff did not raise a triable issue on the question of malice. A few weeks later Mendelzon and Broadway successfully moved for summary judgment in their favor, the court finding that the BMQA report was absolutely privileged under section 47, subdivision 2 (hereafter section 47(2)), as well as the qualifiedly privileged under sections 43.8 and 47(3); the court made a similar finding of a lack of triable issue on the question of malice. Plaintiff appeals from both of these judgments.

APPEAL

I.

*The Standard of Review*

This case reaches us after successful motions for summary judgment. ■ "Summary judgment is properly granted where the evidence in support of the moving party conclusively negates a necessary element of the plaintiff's case *or establishes a complete defense* and thus demonstrates that under no hypothesis whatever is there a material factual issue which requires the process of a trial. [Citations.] ■ In making its determination, the trial court may rely on 'affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice . . . may be taken.' [Citations.] The party opposing the motion for summary judgment supported by such . . . [documents] has the burden of showing that triable issues of fact exist. [Citation.] 'The purpose of the summary procedure is to penetrate through evasive language and . . . adept pleading and ascertain the existence or absence of triable issues.' (*Chern* v. *Bank of America* [(1976) 15 Cal.3d 866] at p. 873 [127 Cal.Rptr. 110, 544 P.2d 1310].)" (*Osmond* v. *EWAP, Inc.* (1984) 153 Cal.App.3d 842, 850 [200 Cal.Rptr. 674], italics added.) Here, the evidence set forth in the moving and opposition papers demonstrated that the basis of plaintiff's lawsuit

---

[2] Unless otherwise indicated, all further statutory references are to the Civil Code.

rested upon the 1977 BMQA report filed by Mendelzon and the 1980 letter written by Manley to Centinela. The propriety of summary judgment thus depends upon the nature and extent to which each was a privileged communication.

## II.

### The BMQA Report

■ Section 47(2) provides, in pertinent part: "A privileged publication or broadcast is one made—. . . [¶] 2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable [by writ of mandate] . . . ." The privilege conferred by this section is absolute and is unaffected by the existence of malice. (*Lebbos* v. *State Bar* (1985) 165 Cal.App.3d 656, 667 [211 Cal.Rptr. 847]; *Royer* v. *Steinberg* (1979) 90 Cal.App.3d 490, 500 [153 Cal.Rptr. 499].)

■ BMQA is an administrative agency created by the Legislature whose responsibilities include enforcement of the Medical Practice Act and review of the performance of physicians and surgeons licensed in California. (Bus. & Prof. Code, §§ 2001, 2004; *Long* v. *Pinto* (1981) 126 Cal.App.3d 946, 948 [179 Cal.Rptr. 182].) It is an agency analogous to the State Bar of California, with the duty to investigate complaints and the power to initiate disciplinary proceedings against practitioners. (*Hogen* v. *Valley Hospital* (1983) 147 Cal.App.3d 119, 125 [195 Cal.Rptr. 5]; Bus. & Prof. Code, § 2220; Gov. Code, § 11500 et seq.) Disciplinary actions taken against a licensee are reviewable by application for writ of mandate. (See Bus. & Prof. Code, § 2230, Gov. Code, § 11523.) ■ Accordingly, any publication in connection with BMQA proceedings is clothed with the absolute privilege set forth in section 47(2), as having been made in the course of an "official proceeding" (§ 47(2), cl. (3)) and proceedings reviewable by writ of mandate (§ 47(2), cl. (4); *Long* v. *Pinto, supra,* 126 Cal.App.3d at p. 950).

Furthermore, letters or communications designed to *prompt* official action are as much a part of an "official proceeding" as a communication made after the proceeding has commenced. (*Lebbos* v. *State Bar, supra,* 165 Cal.App.3d 656, 668; *Long* v. *Pinto, supra,* 126 Cal.App.3d 946, 948-949; *King* v. *Borges* (1972) 28 Cal.App.3d 27, 34 [104 Cal.Rptr. 414].) The reason for this rule is that an administrative agency, to function effectively, must have an "open channel" by which concerned persons may call attention to suspected wrongdoing. (*King* v. *Borges, supra,* at p. 34.) As a matter of public policy, "[T]he importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal

activity outweighs the occasional harm that might befall a defamed individual." (*Ibid.;* see also *Long* v. *Pinto, supra,* at p. 950 [126 Cal.App.3d].)

 The BMQA report filed by Mendelzon in January 1977 unquestionably falls within the protection of this privilege. Business and Professions Code section 805 *requires* a hospital administrator to report to BMQA all actions undertaken to suspend, revoke or curtail the staff privileges of any physician or surgeon for more than 45 days. (See fn. 1, *ante.*) Although plaintiff resigned from Broadway shortly after the imposition of the credentials committee's restriction on his staff privileges and prior to hearing on a final determination by the executive committee, Mendelzon believed that, as Broadway's administrator, section 805 imposed upon him a mandatory duty to report the action to BMQA. BMQA affirmed the same belief in its letter to Mendelzon several months later. That belief was erroneous since the curtailment of privileges did not extend beyond the 45-day threshold period necessary to trigger a reporting requirement. Nevertheless, Mendelzon's misinterpretation of the statute did not affect the basic purpose of the report, which was to notify BMQA of events which might warrant the investigation of a licensed physician.

In *Long* v. *Pinto, supra,* 126 Cal.App.3d 946, 948, an informal letter of complaint to BMQA pertaining to plaintiff doctor was held to be absolutely privileged under section 47(2). Even stronger policy considerations compel application of that privilege to a report to BMQA made under a good faith belief that the communication is required by law.[3]

Plaintiff's brief repeatedly emphasizes his declaration that he was not notified of the BMQA report or the disciplinary action undertaken by Broadway until three years after the fact. He asserts that Broadway's failure to properly notify him of the proceedings deprived him of "due process of law." He cites *Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 478 [131 Cal.Rptr. 90, 551 P.2d 410] for the proposition that Broadway's failure to afford him proper procedural rights under its bylaws to contest the discipline imposed in Dr. Glover's letter strips it of the immunity granted by section 47(2). The cited portion of *Westlake* merely holds that where defendant hospital failed to afford a staff physician her procedural rights, it could not rely on the exhaustion of remedies doctrine

---

[3] We note that Business and Professions Code section 805 was recently amended to add the following language: "*No person shall incur any civil or criminal liability* as the result of making any report required by this section." (Stats. 1986, ch. 1274, § 1, italics added.) The 1986 amendment underscores the Legislature's patent intent that hospital and medical personnel who file BMQA disciplinary reports be free from the prospect of having to defend themselves in court as the result of any statements contained therein.

as a complete defense in a tort action based upon a wrongful termination of staff privileges. Unlike *Westlake,* however, plaintiff's lawsuit is premised solely upon the *statements* made in the BMQA report, not the underlying disciplinary action undertaken by the credentials committee. The *Westlake* opinion was careful to note that statements made in the course of official proceedings (as distinguished from the actions of the peer evaluation committees) have always enjoyed the absolute immunity set forth in section 47(2). (17 Cal.3d at p. 482.)

Plaintiff confuses the *propriety* or justification for the disciplinary action with the *communication* of that action to BMQA. Regardless of the merits of Broadway's restriction on plaintiff's privileges, Mendelzon's reporting of that action to the state agency responsible for monitoring the performance of licensed physicians was absolutely privileged. ▇ Although the complaint sets forth an alternative cause of action for intentional infliction of emotional distress as the result of Mendelzon's report, it is settled that the privilege provided by section 47(2) may not be defeated by asserting a different tort theory based upon the same protected communication. (*Dong* v. *Board of Trustees* (1987) 191 Cal.App.3d 1572, 1593 [236 Cal.Rptr. 912]; *Lebbos* v. *State Bar, supra,* 165 Cal.App.3d 656, 667; *Chen* v. *Fleming* (1983) 147 Cal.App.3d 36, 40 [194 Cal.Rptr. 913].) ▇ Mendelzon and Broadway were entitled to judgment as a matter of law.[4]

## III.

### *The Manley Letter*

▇ The trial court found that Manley's letter to Centinela summarizing plaintiff's proctor reports and his discipline at Broadway was protected by the qualified privileges set forth in sections 43.8 and 47(3). We agree.

▇ Section 43.8 provides, in pertinent part: "In addition to the privilege afforded by Section 47, there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person on account of the communication of information in the possession of such person to any hospital, hospital medical staff, . . . [or] peer review committee . . . when such communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing . . . arts and does not represent as true any matter not reasonably believed to be true." This section affords a qualified privilege to any communication of information intended to aid in evaluating a physician's qua-

---

[4] Because of our conclusion, we need not reach and do not express any opinion on the issue of whether other privileges also attach to the BMQA report.

lifications, character and fitness to institutions such as hospitals and peer review committees who have a strong interest in receiving such information. (See *Hackethal* v. *Weissbein* (1979) 24 Cal.3d 55, 60 [154 Cal.Rptr. 423, 592 P.2d 1175, 9 A.L.R.4th 791].)

The Manley letter was certainly intended to aid in the evaluation of plaintiff's qualifications, and plaintiff does not contend otherwise. In fact, the letter was solicited by Centinela's credentials committee for the *purpose* of assisting its consideration of plaintiff's application for staff privileges. Thus, the qualified immunity for communications evaluative of medical practitioners set forth in section 43.8 is applicable.

■ Section 47(3) grants a privilege to any publication or broadcast made "without malice," to a person interested therein, "(2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

There can be no doubt that Centinela was a "person interested" within the meaning of this section. The information served an important interest which Centinela had in assessing the qualifications and fitness of a proposed staff member. Indeed, the Legislature itself has explicitly recognized the important interest which hospitals and peer review committees have in evaluative reports on staff doctors by creating the parallel qualified privilege set forth in section 43.8, discussed previously.

Manley qualified as "one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent . . ." (§ 47(3), cl. (2)) since he was the administrator of Vallejo General, had never met plaintiff, and was the logical authority to respond to an inquiry concerning plaintiff's personnel records. Manley was also directly requested to provide the information in question; therefore the letter came within the purview of section 47(3), clause (3) as well.

The only remaining question is whether the letter was written with "malice." ■ Once a qualified privilege is shown to be applicable, plaintiff has the burden of producing evidence of malice. (*Williams* v. *Taylor* (1982) 129 Cal.App.3d 745, 752 [181 Cal.Rptr. 423]; *Warfield* v. *McGraw-Hill, Inc.* (1973) 32 Cal.App.3d 1041, 1047 [108 Cal.Rptr. 652].)

The trial court's task was to determine, from the moving and opposing papers, whether there was "a sufficient showing of malice to warrant submission of that issue to the jury. [Citations.]" (*Good Government Group of*

*Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572]; *Osmond* v. *EWAP, Inc., supra,* 153 Cal.App.3d 842, 854-855.)

Malice is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights. *(Frommoethelydo* v. *Fire Ins. Exchange* (1986) 42 Cal.3d 208, 217 [228 Cal.Rptr. 160, 721 P.2d 41]; accord, *Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134 Cal.Rptr. 402, 556 P.2d 764]; *Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 936 [119 Cal.Rptr. 82].) There is nothing in the moving papers to support a finding by a reasonable trier of fact that the Manley letter was motivated by hatred or ill will towards plaintiff. In deposition, plaintiff admitted that he had never met Manley and did not even know who he was. Plaintiff produced no evidence which would give rise to an inference that the motivation for Manley's letter was anything other than a good faith attempt to respond to Centinela's inquiry.

Nor does there seem to be any dispute that the Manley letter was a substantially *accurate* summary of plaintiff's evaluation reports. The reports, which were part of the record before the trial court, contain entries supporting every statement made in the letter. The letter objectively noted that, despite some negative reports, "[o]ther reports indicated adequate care." Finally, Manley's summarization of the action of the credentials committee in November 1976 was simply a rephrasing of the language in Dr. Glover's letter.

Plaintiff's chief argument is that malice can be inferred because Manley wrote the letter without undertaking an investigation which would have revealed that the negative proctor reports were "unreliable" and "biased" and that plaintiff had never received notice of the disciplinary action taken against him. But even if we accept plaintiff's asserted lack of knowledge of the disciplinary action, such ignorance did not render the *fact* that he was disciplined any less truthful. Moreover, plaintiff did not show that there was anything in his file which indicated either that the source of the reports or the information contained therein was unreliable. Mere negligence in inquiry cannot constitute a lack of reasonable or probable cause. *(Rollenhagen* v. *City of Orange* (1981) 116 Cal.App.3d 414, 423 [172 Cal.Rptr. 49]; *Roemer* v. *Retail Credit Co.* (1970) 3 Cal.App.3d 368, 371 [83 Cal.Rptr. 540].) Where the publication comes from a known reliable source and there is nothing in the circumstances to suggest inaccuracy, there is no duty to investigate. (See *Bindrim* v. *Mitchell* (1979) 92 Cal.App.3d 61, 73 [155

Cal.Rptr. 29].)[5] If a hospital administrator, who ordinarily possesses no medical training or experience, were under a duty to undertake an independent investigation of the accuracy of peer evaluations written by staff physicians in order to negate an inference of malice, the conditional privilege provided by the Legislature in section 43.8 would become a nullity. (See *Frommoethelydo* v. *Fire Ins. Exchange, supra,* 42 Cal.3d 208, 219-220.) Plaintiff's equation of malice with negligence is contrary to established law and must be rejected.

■ Although, in ruling on a motion for summary judgment the affidavits of the nonmoving party are to be liberally construed in his favor (*Eagle Oil & Ref. Co.* v. *Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264]), "it is the duty of the trial judge to review the evidence presented by the counteraffidavits in order to determine whether there is sufficient evidence to present a triable issue," and the mere assertion by the opposing party that defendants were motivated by ill will is of itself insufficient to warrant denial of a motion for summary judgment. (*McCunn* v. *California Teachers Assn., supra,* 3 Cal.App.3d 956, 964.) ■ The superior court did not err in ruling that there was no competent evidence that the letter was written with malice so as to overcome the qualified privileges set forth in sections 43.8 and 47(3). The motion for summary judgment as to Manley and Vallejo General was properly granted.

## IV.

### Due Process

■ Plaintiff lastly contends that judicial enforcement of the absolute and qualified privileges which the trial court found applicable would violate due process of law. He reasons that because Broadway allegedly disciplined him without proper notice and an opportunity to be heard, applying statutory privileges to third-party communication of that discipline would amount to a judicial sanctioning of such constitutional violations. Again, plaintiff's argument is misfocused.

---

[5] Plaintiff argues that the "general appearance" and the "tailor-made" nature of the reports were "suspicious" and required a "prudent administrator" to investigate their accuracy. We find nothing in the record to support these characterizations.

Plaintiff also places much emphasis on proffered evidence that a "Dr. Frank," one of the physicians who filed a negative proctor report on plaintiff, had a grudge against him and wanted to ruin his reputation by "spreading false rumors." The crucial fact however, is that there is no evidence Manley was aware of any bias in the reports or had any other basis to doubt their reliability. As one court said in a similar context, " '[t]here is no question that many persons were critical of plaintiff's performance as superintendent. Some of these conceivably could have felt actual ill will towards plaintiff. *But there is not the slightest indication that any of the defendants did.* ' " (*McCunn* v. *California Teachers Assn.* (1970) 3 Cal.App.3d 956, 963-964 [83 Cal.Rptr. 846], italics added.)

Plaintiff's complaint did not seek judicial reversal of the disciplinary action imposed by the credentials committee or damages arising from wrongful curtailment of his privileges. The sole basis for the action was that the hospital officials who reported information extracted from his personnel file had *defamed* him. Protecting such transmittals against defamation actions is necessary to accomplish the strong policy goals of maintaining a high quality of professional medical care. (See *Long* v. *Pinto, supra,* 126 Cal.App.3d 946, 951.) If plaintiff sought to challenge either the discipline which was imposed or the process by which it was accomplished he had other remedies available to him. (Cf. *Westlake Community Hosp.* v. *Superior Court, supra,* 17 Cal.3d 465, 478.) Upholding the legislatively sanctioned privileges for confidential reporting of peer evaluations and disciplinary actions does not infringe upon a wrongly disciplined physician's right to appropriate redress through the courts.

### Disposition

The judgments are and each of them is affirmed.

Kline, P. J., and Benson, J., concurred.