# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**August 17, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

JOHN D. CRABTREE, M.D.    )
              )
  Plaintiff/Appellant,    )  Putnam Chancery No. 94-50
              )
**v.**             )
              )  Appeal No. 01A01-9807-CH-00370
**DAVID T. DODD, M.D.,**    )
              )
  Defendant/Appellee.    )

## APPEAL FROM THE CHANCERY COURT OF PUTNAM COUNTY
### AT COOKEVILLE, TENNESSEE

### THE HONORABLE JOHN ROLLINS, CHANCELLOR

For the Plaintiff/Appellant:      For the Defendant/Appellee:

Steven C. Douse         Noel F. Stahl
Nashville, Tennessee        Joseph R. Wheeler
              Nashville, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION____**

This case involves an impaired physician. The plaintiff physician sued the medical director of the Tennessee Medical Association's Impaired Physician Program for allegedly revealing confidential information to the plaintiff's medical malpractice insurance carrier about the plaintiff's alleged alcohol dependency, causing the non-renewal of his insurance policy. The trial court granted summary judgment in favor of the defendant. We affirm.

The Tennessee Medical Association ("TMA") offers assistance to physicians with substance abuse problems through its Impaired Physicians Program ("Impaired Physicians Program") and its Impaired Physicians Peer Review Committee ("Peer Review Committee").[1] The Peer Review Committee makes the policies of the Impaired Physicians Program and is responsible for monitoring the rehabilitation process for physicians with chemical dependency or mental illness. The Peer Review Committee is comprised of several physicians who conduct the medical peer reviews. When a physician is referred to the Impaired Physicians Program and agrees to participate in the treatment program, the Peer Review Committee will advocate for the physician before local peer review committees, hospital committees, insurance carriers, and licensing authorities.

Defendant/Appellee, David Dodd, M.D. ("Dr. Dodd"), is a physician licensed by the State of Tennessee and the medical director of the Impaired Physicians Program. Dr. Dodd is not a member of the Peer Review Committee, but reports directly to the Committee in his role as medical director of the Impaired Physicians Program. To assess and interview physicians referred to the Impaired Physicians Program, Dr. Dodd may meet with the individual physicians. The meetings are to determine the physician's need for professional evaluation by substance abuse or mental illness facilities. It is undisputed on appeal that a physician-patient relationship is not formed during these initial assessments.

Physicians who are candidates for independent professional evaluation are offered options and recommendations on health care facilities for treatment. Neither Dr. Dodd nor the Peer Review

---

[1]    The TMA created the Tennessee Medical Foundation, which assumed administration of the Impaired Physicians Program in April, 1992. Prior to that time, and at the time of the events in this case, the Impaired Physicians Program was administered by the TMA.

Committee provide diagnosis or treatment. The physician must continue treatment and participation in the Impaired Physicians Program in order for the Peer Review Committee to advocate for the physician. This is sometimes referred to as "advocacy status."

Plaintiff/Appellant, John Crabtree, M.D. ("Dr. Crabtree"), is a physician licensed by the State of Tennessee. During the events at issue in this case, Dr. Crabtree was a general surgeon in Putnam County and had physician privileges at Cookeville General Hospital. Dr. Crabtree had medical malpractice insurance through State Volunteer Mutual Insurance Company ("State Volunteer"), a medical malpractice insurance company. State Volunteer was founded by physicians in Tennessee to provide medical malpractice coverage. Dr. Crabtree was an original shareholder, and had been insured by State Volunteer from the date of its formation in 1976.

From 1976 to 1988, Dr. Crabtree was not required to re-apply or update information in his file in order to renew his insurance with State Volunteer. In 1988, State Volunteer began seeking periodic updates of its insured physicians.

In 1989 and early 1990, Dr. Crabtree was arrested twice within a six-month period, once for public drunkenness and once for driving under the influence. On February 7, 1990, Cookeville General Hospital requested that the Impaired Physicians Program evaluate Dr. Crabtree for alcohol impairment.

Pursuant to the request by Cookeville General Hospital, Dr. Dodd contacted Dr. Crabtree in February, 1990 about evaluation for possible treatment as an impaired physician. Dr. Crabtree rejected participation in the Impaired Physicians Program because he believed that he was already receiving adequate professional assistance. Dr. Crabtree alleges that this angered Dr. Dodd, and that Dr. Dodd threatened Dr. Crabtree with the loss of his malpractice insurance and his medical license if he refused to participate.

In July 1990, Dr. Crabtree was again arrested for driving under the influence. After this arrest, Cookeville General Hospital notified Dr. Crabtree that it would take formal action against him. State Volunteer notified Dr. Crabtree that it was reviewing his insurability.

In August 1990, Dr. Crabtree took a leave of absence for treatment for alcohol dependency and entered a treatment program in Georgia. Dr. Crabtree was dissatisfied with this program,

criticizing it as "superficial." He left the Georgia facility after four days, contrary to the physicians' recommendation of further treatment.

Once again, Cookeville General Hospital threatened to suspend Dr. Crabtree's hospital privileges. On August 22, 1990, Dr. Crabtree entered the Cumberland Heights Drug and Alcohol Treatment Center in Nashville. Dr. Crabtree completed the inpatient program at Cumberland Heights and was discharged on September 19, 1990. Cookeville General Hospital wrote Dr. Dodd in September 1990, informing him that Peer Review Committee advocacy was a condition of his resuming his practice at the Hospital. The Hospital requested that Dr. Dodd monitor Dr. Crabtree's treatment.

In September 1990, Dr. Dodd met with Dr. Crabtree, as well as Dr. Crabtree's attorney, Larry Hart, and Dr. Crabtree's counselor, George Allen. At the meeting, Dr. Crabtree agreed to continue therapy at Cumberland Heights for thirty days in return for the Impaired Physicians Program's advocacy. Dr. Crabtree also signed a Therapy Agreement providing that the Peer Review Committee would advocate for Dr. Crabtree in matters before the Board of Medical Examiners, for his hospital privileges at Cookeville General Hospital, and for Dr. Crabtree's continued medical malpractice insurance coverage. The Agreement stated that, in return for Dr. Crabtree's continued treatment, the Program would:

> . . . advocate for Dr. Crabtree in the following, but not limited to, areas:
>
> > 1. Shall contact [State Volunteer] regarding Dr. Crabtree's malpractice insurance and have a hold placed on action to cancel the insurance as well as ensuring that the company provides tail coverage while he is not practicing.
> >
> > 2. Advocate for Dr. Crabtree on any matter that may come before the Board of Medical Examiners.
> >
> > 3. Advocate on Dr. Crabtree's behalf should any adverse action be initiated against his privileges at Cookeville General Hospital.

Despite the language of the Agreement, Dr. Crabtree stated in his affidavit before the trial court that "[t]here was no discussion of advocacy before either [State Volunteer] or the State Board of Medical Examiners, and I did not understand these to be part of the agreement." In addition, Dr. Crabtree stated, "I did not read [the Agreement] carefully and did not realize that it authorized Dr. Dodd to contact [State Volunteer] and advocate for my continued coverage, thereby representing to [State Volunteer] that I was indeed an impaired physician and a high risk."

3

In November, 1990, after Dr. Crabtree successfully completed two months of therapy, Dr. Dodd wrote Cookeville General Hospital, outlining the conditions of advocacy and recommending that Dr. Crabtree's hospital privileges be reinstated so long as he complied with the conditions. The Agreement required Dr. Crabtree to participate in an aftercare program and monthly monitoring meetings with Dr. Dodd. These terms were incorporated in a letter from Cookeville General Hospital to Dr. Crabtree, signed by Dr. Crabtree in December 1990, providing that his hospital privileges would be reinstated if he complied with the terms of the letter. On December 11, 1990, Dr. Crabtree's hospital privileges at Cookeville General Hospital were restored.

Dr. Crabtree asserts that Dr. Dodd met with Hospital representatives in November 1990 without notifying Dr. Crabtree in advance of the meeting. Dr. Crabtree states that when Dr. Dodd came to his office to tell him that the Hospital had agreed to restore his privileges, Dr. Dodd told Dr. Crabtree's staff that he needed to see Dr. Crabtree immediately and that he was a powerful man and should not be kept waiting. Dr. Crabtree states that when Dr. Dodd told him of the meeting with the Hospital representatives, Dr. Crabtree asked why he had not been notified of the meeting. Dr. Crabtree contends that Dr. Dodd then became angry and shouted at Dr. Crabtree.

Dr. Dodd and Dr. Crabtree met several times in the spring of 1991. Dr. Crabtree maintains that he was "troubled" by the meetings because (1) Dr. Dodd spoke to him about other impaired physicians, identifying them by name, and (2) Dr. Dodd became angry because Dr. Crabtree would not "be his friend" and "share intimate thoughts and feelings." Dr. Crabtree asserts that Dr. Dodd told him that his unwillingness to do so made Dr. Dodd "want to say to hell with me, and at that point I had lost a friend and become a 'potential enemy.'" After meeting with Dr. Dodd on May 10, 1991, Dr. Crabtree no longer met with Dr. Dodd.

Nevertheless, the Peer Review Committee continued advocating for Dr. Crabtree. In October 1991, the Board of Medical Examiners sent Dr. Crabtree a letter regarding its investigation, which was triggered by Dr. Crabtree's DUI conviction and subsequent treatment for alcoholism. The Board proposed a settlement that required Dr. Crabtree to sign a contract, to be furnished within thirty days, with the TMA's Impaired Physicians Program. The letter indicated that, if Dr. Crabtree rejected the settlement proposal, the case would be processed as a disciplinary matter.

4

In November 1991, the TMA sent Dr. Crabtree a proposed Impaired Physicians Peer Review Committee Aftercare Contract, outlining the conditions for the Peer Review Committee to act as Dr. Crabtree's advocate. The proposal included an assessment by an independent psychiatrist, with Dr. Crabtree maintaining contact with the psychiatrist instead of Dr. Dodd. The psychiatrist would then report to Dr. Dodd generally on whether Dr. Crabtree was in compliance with the psychiatrist's recommendations.

After conferring with his attorney, Dr. Crabtree decided not to sign the proposed aftercare contract. He stated in his deposition that he chose not to sign the agreement because he "did not think that that was indicated and the right thing to do," and that it was not necessary for him. Dr. Crabtree acknowledged that he understood at the time that his refusal to sign the agreement could adversely affect the Peer Review Committee's advocacy on his behalf before the Board of Medical Examiners, the Hospital and his malpractice insurance carrier.

On March 2, 1992, the Peer Review Committee sent Dr. Crabtree a letter informing him that "further advocacy is no longer appropriate given the events that have occurred over the last several months." The letter informed Dr. Crabtree that the Peer Review Committee would notify Cookeville General Hospital of its decision. In addition, the Peer Review Committee indicated that if State Volunteer asked the Peer Review Committee about Dr. Crabtree's advocacy status, the Peer Review Committee would inform State Volunteer that Dr. Crabtree's advocacy status had been terminated.

On June 3, 1992, State Volunteer sent Dr. Crabtree a letter informing him that it was not renewing his medical malpractice insurance policy. State Volunteer told Dr. Crabtree that it had recently reviewed his insurability:

> In the Committee's assessment of your insurability, it received a report from a representative of the Tennessee Medical Association's Impaired Physician Committee and was advised that you no longer have the advocacy of this program. Thereafter, a decision was made not to renew your policy when it expires August 5, 1992.

The letter also informed Dr. Crabtree of his right to a review of the decision to not renew his policy.

Apparently Dr. Crabtree requested a reconsideration of State Volunteer's decision. A second letter from State Volunteer to Dr. Crabtree dated July 24, 1992, explains that the decision not to

renew was upheld upon reconsideration. State Volunteer discussed Dr. Crabtree's loss of advocacy:

> In the course of its substantial experience in insuring physicians who have - or have had - a chemical dependency problem or other impairment, [State Volunteer] has had good underwriting experience where these physicians have been participants in an impaired physician program of the sort operated by the state medical societies in Tennessee and in its adjoining states in which [State Volunteer] offers coverage. In fact, were it not for the existence of these specific programs, [State Volunteer] probably could not offer coverage to such physicians due to the underwriting risks involved, and under [State Volunteer's] underwriting guidelines, the loss of - or failure to achieve - the advocacy of such a program in the state where the physician practices are grounds for denial of coverage.

State Volunteer's letter explained that, since July 30, 1990, it had continued to issue short term insurance policies to Dr. Crabtree "because [State Volunteer] was advised that you continued to enjoy some form of advocacy by the TMA [Impaired Physicians Program] as our underwriting guidelines require." Dr. Crabtree's final insurance policy expired August 5, 1992 by its own terms.

On January 31, 1994, Dr. Crabtree filed a lawsuit in Chancery Court against Dr. Dodd, asserting a violation of Tennessee Code Annotated § 47-50-109, which makes it unlawful for any person to induce the breach of a contract. Dr. Crabtree also alleged common law causes of action for breach of contract, intentional interference with contractual relations, and interference with prospective business advantage. Dr. Crabtree contended that he and Dr. Dodd had a physician-patient relationship and that Dr. Dodd's divulgence of confidential matters known as a result of this relationship was unlawful, intentional, and malicious. Dr. Crabtree asserted that as a result of Dr. Dodd's malfeasance, State Volunteer terminated and refused to renew Dr. Crabtree's medical insurance. Dr. Crabtree asserted that his insurance had been renewed yearly before Dr. Dodd's contact with State Volunteer. Dr. Crabtree sought damages pursuant to Tennessee Code Annotated § 47-50-109, which provides for treble damages against any person who induces the breach of a valid contract.[2] Dr. Crabtree also sought common law punitive damages, attorney's fees, costs, and an injunction "requiring [Dr. Dodd] to take all steps necessary to rectify the harm his malfeasance

---

[2]     Tennessee Code Annotated § 47-50-109 provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109 (1995).

6

has inflicted upon [Dr. Crabtree]."

In his Answer, Dr. Dodd denied the existence of a physician-patient relationship or any breach of confidentiality. He denied causing a breach of any alleged contract between Dr. Crabtree and State Volunteer. Dr. Dodd admitted that, as the medical director of the Impaired Physicians Program, he arranged meetings between Dr. Crabtree and other physicians and agreed to advocate for Dr. Crabtree so long as he satisfactorily complied with the terms of the treatment program, but denied that he and Dr. Crabtree had a contractual agreement with an implied promise of confidentiality. Dr. Dodd admitted there was a contractual agreement between himself and the Tennessee Medical Association. Dr. Dodd raised the affirmative defenses of failure to state a claim upon which relief may be granted and statute of limitations. In addition, Dr. Dodd asserted that at all times relevant to the case, he was acting in his official capacity as the medical director of the Impaired Physicians Program and his actions constituted statutorily authorized and privileged medical peer review, and thus he is afforded statutory immunity pursuant to the Tennessee Peer Review Law, Tennessee Code Annotated § 69-6-219, and the Federal Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-11152. Dr. Dodd sought attorney's fees for his defense against Dr. Crabtree's claims.

Discovery was lengthy and disputed. Several discovery motions were filed, including two motions to compel filed by Dr. Dodd. Both the TMA and State Volunteer filed motions to quash Dr. Crabtree's discovery requests as overbroad. These motions were granted. After Dr. Crabtree served a second set of subpoenas on the TMA and State Volunteer, they filed motions to quash, as well as motions seeking a protective order. Dr. Dodd filed a motion for summary judgment with supporting affidavits on November 26, 1997. The trial court delayed the hearing on the second set of motions to quash filed by the TMA and State Volunteer until after the hearing on the summary judgment motion. Because of the disposition of the case on the motion for summary judgment, the trial court never resolved the discovery motions. Depositions of both Dr. Dodd and Dr. Crabtree obtained during discovery were made a part of the record.

Dr. Dodd's motion for summary judgment asserted that Dr. Crabtree could not establish the elements necessary for interference with contractual relations and that the tort of interference with prospective business advantage is not recognized in Tennessee. Dr. Dodd again asserted statutory immunity pursuant to the Tennessee Peer Review Law, Tennessee Code Annotated § 63-6-219, and

7

the Federal Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-11152. Dr. Dodd attached several documents to his motion for summary judgment, including the depositions of both Dr. Dodd and Dr. Crabtree, Dr. Dodd's affidavit, the insurance policy between Dr. Crabtree and State Volunteer, articles from the local newspaper on Dr. Crabtree, medical records from a drug and alcohol center Dr. Crabtree attended, the therapy agreement signed by Dr. Crabtree setting forth Dr. Crabtree's and the Impaired Physicians Program's responsibilities, letters explaining that the Impaired Physicians Program's advocacy was dependent on Dr. Crabtree's completion of the therapy program, and letters from State Volunteer to Dr. Crabtree explaining that his loss of advocacy status was a factor in its decision not to renew the insurance policy. Dr. Dodd also attached the affidavit of James E. Smith, Vice-President of Underwriting for State Volunteer, which explained that State Volunteer had the contractual right to not renew its policy with Dr. Crabtree according to the policy's terms. In his affidavit, Smith denied that State Volunteer breached the policy.

Dr. Dodd filed a memorandum of law in support of his motion for summary judgment. His memorandum asserted that Dr. Crabtree could not establish the essential element of breach of contract for his claim of interference with contractual relations because the State Volunteer insurance policy expired by its own terms on August 5, 1992. Dr. Dodd also argued that Dr. Crabtree had not shown that Dr. Dodd had malicious intent to cause a breach, another essential element of interference with contractual relations. Dr. Dodd contended that the tort of interference with prospective business advantage is not recognized in Tennessee. Finally, Dr. Dodd asserted that his actions are protected by statutory immunity under both 42 U.S.C. §§ 11101-11152 and Tennessee Code Annotated § 63-6-219 for persons engaged in good faith peer review activity.

In Dr. Dodd's affidavit, he denied making the final decision to drop Dr. Crabtree's advocacy status, asserting that the Peer Review Committee made the final decision. He also denied acting with ill will or malice or inducing State Volunteer to not renew Dr. Crabtree's insurance policy. To his knowledge, Dr. Dodd asserted that none of the information that he provided to the Peer Review Committee, TMA, or State Volunteer was false.

In Dr. Crabtree's deposition, Dr. Crabtree admitted that he had understood that the Peer Review Committee was advocating for the continuance of his malpractice insurance and that he did not object when the Peer Review Committee advocated before State Volunteer. For example, after the expiration of the Therapy Agreement that Dr. Crabtree signed, Dr. Crabtree knew that Dr. Dodd had advocated on Dr. Crabtree's behalf before State Volunteer and Dr. Crabtree did not object:

> Q: You were aware in fact after 30 days from the date of this agreement that Dr. Dodd had in fact advocated for you and on your behalf before [State Volunteer] as far as your medical malpractice insurance is concerned? You knew that, didn't you?
> A: At some point in time, yes.
> Q: And you never asked him not to do that?
> A: No.

Dr. Crabtree acknowledged that, by December 1990, he knew that State Volunteer required Peer Review Committee advocacy for continued insurance coverage. As a result, in December 1990 Dr. Crabtree never communicated to Dr. Dodd any desire that Dr. Dodd refrain from advocating on Dr. Crabtree's behalf before State Volunteer. Dr. Crabtree testified that Dr. Dodd was still advocating before State Volunteer in March 1991. In fact, Dr. Crabtree testified that he sought Peer Review Committee advocacy until his advocacy status was terminated in the spring of 1992.

In Dr. Crabtree's response to Dr. Dodd's summary judgment motion, he argued that the breach of contract element of the tort of interference with contractual relations could be established by showing that State Volunteer breached an implied contract to renew the policy or by showing that Dr. Dodd maliciously procured a termination of the contract. Dr. Crabtree indicated that he needed further discovery. Dr. Crabtree asserted that Dr. Dodd was not entitled to immunity under the federal or state immunity statutes because his communication with State Volunteer was not in furtherance of his advocacy for impaired physicians.

Dr. Crabtree attached his own affidavit to his response to Dr. Dodd's summary judgment motion. In his affidavit, Dr. Crabtree recounted the incidents that made him uncomfortable with the Impaired Physicians Program treatment plan. He described the occasion on which Dr. Dodd came to Dr. Crabtree's office to tell him of the reinstatement of his hospital privileges, and became angry and shouted at Dr. Crabtree for asking why he had not been notified of the meeting. Dr. Crabtree said that he felt uncomfortable about Dr. Dodd's discussion of other physicians who were participating in the Impaired Physicians Program. Dr. Crabtree asserted that Dr. Dodd would become angry when Dr. Crabtree "wasn't willing to open up and be his friend." He claimed that Dr.

9

Dodd told him that his unwillingness to share intimate thoughts and feelings made Dr. Dodd "want to say to hell with me, and at that point I had lost a friend and become a 'potential enemy.' "

Dr. Crabtree attached to his affidavit a copy of the TMA's Peer Review Procedures Booklet, dated October 13, 1991. The TMA Booklet outlines procedures, such as notice and a hearing, to be followed in grievance or disciplinary actions against physicians brought by grievance or disciplinary committees. Dr. Crabtree argued that TMA was required by its own procedures to grant him a hearing, and that malice should be inferred from the TMA's refusal to do so. Dr. Crabtree asserted that he requested a hearing after Dr. Dodd informed him of his loss of advocacy status, but that his request was denied.

Dr. Crabtree admitted that he had no proof that Dr. Dodd was present at any meeting with State Volunteer at which it decided not to renew his insurance. However, he asserted that a State Volunteer employee told him that Dr. Dodd provided State Volunteer with the information that Dr. Crabtree's advocacy status had been terminated. Dr. Crabtree asserted that he could not confirm Dr. Dodd's involvement because his discovery requests were quashed. Dr. Crabtree maintained that he understood his renewal with State Volunteer to be automatic. For purposes of the summary judgment motion, Dr. Crabtree admitted that there was no physician-patient relationship between Dr. Dodd and himself and that they had no written agreement concerning confidentiality.

At the hearing on Dr. Dodd's motion for summary judgment, Dr. Crabtree conceded that the tort of "interference with prospective economic advantage," originally pled in his complaint, is not recognized as a cause of action in Tennessee. Dr. Crabtree then sought to amend his complaint to allege a new cause of action for "interference with business relations."

On June 5, 1998, the trial court filed a written opinion granting Dr. Dodd's motion for summary judgment. The trial court found that, under the terms of State Volunteer's policy, State Volunteer had the absolute right to terminate the policy when it was up for renewal. Noting the policy language that the policy was non-renewable and cancelable at will by either party, the trial court rejected Dr. Crabtree's argument that there was an implied contract for renewal of the policy. The trial court concluded that the policy expired by its own terms on August 5, 1992 and that State Volunteer did not breach the contract by declining to renew it. The trial court also ruled that Dr.

10

Crabtree was judicially estopped from amending his complaint to allege "interference with business relations" because it would be inconsistent with his previous pleadings.

In view of its finding that State Volunteer did not breach the insurance policy, the trial court declined to rule on the immunity issues raised in Dr. Dodd's summary judgment motion. The trial court concluded, however, that "had [immunity] been a viable issue it is the opinion of the undersigned that the defendant, Dr. Dodd, would have been entitled to statutory immunity as a matter of law." The trial court reasoned that even though there may have been a personality conflict between Dr. Crabtree and Dr. Dodd, "the record is barren of any proof of such bad acts" by Dr. Dodd that would constitute bad faith or malice and thus bar immunity.

On appeal, Dr. Crabtree argues that the trial court erred in finding that Dr. Dodd would be immune under the Tennessee peer review statute and the Federal Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101-11152. Dr. Crabtree also argues that the trial court erred in finding that there was no breach of contract and that Dr. Crabtree was estopped from pleading interference with business relations. Dr. Crabtree argues that he should have been allowed to conduct further discovery before the trial court ruled on Dr. Dodd's summary judgment motion.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 [now Rule 56.06] provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

*Id.* at 211 (citations omitted).

11

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

On appeal, Dr. Crabtree argues that Dr. Dodd is not entitled to peer review immunity. Dr. Crabtree contends that Dr. Dodd is not immune from suit under the Tennessee peer review statute because he was not acting within the scope and function of a peer review committee, in good faith and without malice, as required by the statute. Dr. Dodd asserts that at all times he was performing authorized medical peer review and that there was no proof of malicious conduct. Moreover, Dr. Dodd points out that Dr. Crabtree's agreement with the TMA specifically requested advocacy on his behalf with State Volunteer. As noted above, the trial court found it unnecessary to rule on the immunity issues, but concluded that, "had [immunity] been a viable issue it is the opinion of the undersigned that the defendant, Dr. Dodd, would have been entitled to statutory immunity as a matter of law" because the record contained no proof that Dr. Dodd acted in bad faith or with malice.

The Tennessee Peer Review Law of 1967, codified at Tennessee Code Annotated § 63-6-219, provides immunity for persons or committees engaged in professional peer review activity "undertaken or performed within the scope or function of the duties of such committees, if made or taken in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist." Tenn. Code Ann. § 63-6-219(d)(1) (1997). The Peer Review Law provides immunity for persons on committees performing peer review activities as well as for any person "acting as a staff member of a medical review committee, any person under contract or other formal agreement with a medical review committee, [or] any person who participates with or assists a medical review committee with respect to its functions." *Id.* The legislative policy in enacting the Peer Review Law was to "encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice medicine." *Id.* § 63-6-219(b)(1). The statute states:

> As incentive for the medical profession to undertake professional review, . . . peer review committees must be protected from liability for their good-faith efforts. To this end, peer review committees should be granted certain immunities

relating to their actions undertaken as part of their responsibility to review, discipline, and educate the profession. . . .

*Id.* § 63-6-219(b)(2). A "peer review committee" or "medical review committee" is defined as:

any committee of a state or local professional association or society, *including impaired physician peer review committees*, programs, malpractice support groups and their staff personnel, . . . or similar entity, the function of which, or one (1) of the functions of which, is to evaluate and improve the quality of health care rendered by providers of health care service to provide intervention, support, or rehabilitative referrals or services . . . .

*Id.* (emphasis added). The statute provides that records and proceedings of peer review committees shall be used "only in the exercise of the proper functions of the committee." *Id.* § 63-6-219(e). "One (1) proper function of such committees shall include advocacy for physicians before other medical peer review committees, peer review organizations, health care entities, *private and governmental insurance carriers*, national or local accreditation bodies, and the state board of medical examiners of this or any other state." *Id.* (emphasis added).

The Peer Review Committee clearly falls within the definition of a "peer review committee" as defined by the statute. Impaired physician peer review committees are specifically listed as an example of a "peer review committee." *See id.* § 63-6-219(c). In addition, the functions of the Peer Review Committee, of providing "intervention, support, or rehabilitative referrals" and of advocating before "private and governmental insurance carriers," fit within the proper functions of a "peer review committee."

Likewise, Dr. Dodd's position falls within the provisions of the statute. As medical director of the Impaired Physicians Program, Dr. Dodd reports to the Peer Review Committee and assists the committee in its functions. Therefore, if Dr. Dodd's actions in this case constitute peer review activities and were taken in good faith and without malice based on facts he reasonably believed to exist, he would be deemed immune under Tennessee Code Annotated § 63-6-219. The burden is on Dr. Crabtree, the party seeking to defeat the protections of the immunity statute, to prove malice and bad faith. *See id.* § 63-6-219(d)(3) (providing that a member of a peer review committee "is presumed to have acted in good faith and without malice"); *see also **Eyring v. Fort Sanders Parkwest Med. Ctr.***, No. 03-S-01-9711-CV-00134, 1999 Tenn. LEXIS 247, at *18 (April 19, 1999). "[T]he burden of proving malice, on motion for summary judgment, requires such evidence,

accepted as true, to show that more probably then [sic] not, the committee acted maliciously. . . . The inquiry must necessarily be made on a case by case basis." *Eyring v. Fort Sanders Parkwest Med. Ctr.*, No. 03A01-9607-CV-00240, 1997 Tenn. App. LEXIS 390 (June 4, 1997), *aff'd by* No. 03-S-01-9711-CV-00134, 1999 Tenn. LEXIS 247 (April 19, 1999). Malice is not defined under the Peer Review Law or elsewhere in Title 63 of the Tennessee Code Annotated.

The issue of malice was addressed in *Alexander v. Memphis Individual Practice Ass'n*, 870 S.W.2d 278, 279 (Tenn. 1993). In *Alexander*, the Memphis Individual Practice Association denied an obstetrician's application to join the Association, claiming it had no need for another obstetrician. The physician's application was eventually approved after several years' wait. *See id.* The physician filed suit and contended that the Memphis Individual Practice Association "delayed approval of his application as punishment for testifying as a plaintiff's expert in medical malpractice lawsuits." *Id.* He argued that the acceptance of employment applications from other obstetricians submitted after his application was denied indicated malice and bad faith on the part of the membership committee. *See id.* at 280. The physician based his claim on a statement by an application committee member that one reason he opposed the physician was because of the physician's testimony for plaintiffs in medical malpractice suits. *See id.* at 279. The Tennessee Supreme Court found that this allegation was not sufficient to prove malice, and thus the Association was immune under the Tennessee Peer Review Law. *See id.* at 280.

The Tennessee Supreme Court again addressed malice under the Peer Review Law in *Eyring v. Fort Sanders Parkwest Medical Center, Inc.*, No. 03-S-01-9711-CV-00134, 1999 Tenn. LEXIS 247 (April 19, 1999). In *Eyring*, a physician who lost his hospital privileges sued the hospital alleging various intentional interference torts. The hospital asserted the defense of peer review immunity under Tennessee Code Annotated § 63-6-219. As proof of malice under the statute, the physician presented affidavits listing the hospital's deviations from its bylaws and affidavits disputing the standard of care asserted by the hospital for physicians such as himself. The Tennessee Supreme Court concluded that the affidavits merely questioned the medical judgment on which the hospital based its decision, and therefore were insufficient evidence from which to infer malice. The Court found no direct evidence of malice; rather, it found that the affidavits provided only conclusory allegations.

14

Other jurisdictions have interpreted malice in peer review settings. The California Court of Appeals has defined malice as "a showing that the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." ***Dorn v. Mendelzon***, 196 Cal. App. 3d 933, 945, 242 Cal. Rptr. 259, 265 (1987). Maine breaks malice into two types: (1) actual malice, which means ill will, or (2) implied malice, which means a reckless disregard for the truth or falsity of the slanderous element of a statement. ***See Onat v. Penobscot Bay Med. Ctr.***, 574 A.2d 872, 874 (Me. 1990).

In ***Scappatura v. Baptist Hospital of Phoenix***, 584 P.2d 1195, 1201 (Ariz. App. 1978), a physician sued a hospital and hospital personnel after he lost his hospital privileges. The Arizona court examined whether the actions of the plaintiff's fellow physicians were immune from liability under Arizona's peer review statutes. The court noted that:

> The purpose and effect of this statute, within which malice and bad faith must be interpreted, are the encouragement of hospital peer review. The goal is the promotion of better patient care, and this statute is directed toward doing so by the exercise of peer review.
>
> Review by one's peers within a hospital is not only time-consuming, unpaid work, it is also likely to generate bad feelings and result in unpopularity. If lawsuits by the unhappy reviewees can easily follow any decision, . . . then the peer review demanded by [the Arizona peer review statute] will become an empty formality, if undertaken at all. Banning such lawsuits except where there is real evidence of actual malice is an integral portion of our legislature's intent.

*Id.* at 1201. The ***Scappatura*** court noted that the Arizona peer review statute, like the Tennessee statute, does not define malice or bad faith. The court concluded that "malice and bad faith" in the context of peer review should "mean a *primary purpose* other than the safeguarding of patients." *Id.* The court found that:

> [M]ere allegations of malice or bad faith, even with specifications of personal animosity and possible prior overreaching of authority, will not suffice to allow an action against hospital personnel engaging in peer review.
>
> A hospital is a place fraught with constant pressure and emergency. In such an atmosphere, personal animosity, jealousy, anger and irritation can be expected, especially when the process of peer review is involved. There must be a great deal more evidence than was presented here to overcome the clear intent of the statute to encourage good faith peer review without fear of reprisal by lawsuit.

*Id.* Thus, despite allegations of personal animosity and procedural irregularities, the appellate court

affirmed the trial court's grant of summary judgment, finding the defendants' actions protected by the immunity statute. *Id.*

In this case, the statement at issue is Dr. Dodd's alleged communication to State Volunteer that Dr. Crabtree's advocacy status had been terminated. In this lawsuit, Dr. Crabtree does not contest the loss of his advocacy status; rather, he alleges that Dr. Dodd's statement to State Volunteer was made with malice and caused him to lose his insurance coverage with State Volunteer.

It is undisputed that Dr. Dodd's alleged statement to State Volunteer was true. There is no allegation that Dr. Dodd made a false statement that was injurious to Dr. Crabtree. Although Dr. Crabtree attempts to argue that he did not know that the Therapy Agreement he signed authorized Dr. Dodd to advocate on his behalf to State Volunteer, Dr. Crabtree acknowledges that once he learned of Dr. Dodd's advocacy on his behalf to the malpractice insurance carrier, he did not ask him to cease. Dr. Crabtree appears to argue that it was proper for Dr. Dodd to advocate <u>for</u> him to State Volunteer, but improper for Dr. Dodd to let State Volunteer know that Dr. Crabtree's advocacy status had been terminated. However, if advocacy is a proper peer review function, then the communication of the loss of advocacy status is merely its "flip side," a necessary part of the overall process. If State Volunteer assumes the risk of insuring an impaired physician based on the Impaired Physicians Program's representation that the impaired physician is undergoing appropriate treatment, there must be a concomitant understanding that State Volunteer will be informed when the Impaired Physicians Program can no longer represent that the insured impaired physician is undergoing such treatment. Dr. Crabtree argues that Dr. Dodd "initiated" contact with State Volunteer to inform it of Dr. Crabtree's loss of advocacy status, apparently contending that Dr. Dodd should have remained silent and allowed State Volunteer to continue to believe that Dr. Crabtree was undergoing treatment sanctioned by the Impaired Physicians Program. However, to do so would adversely affect the credibility of the Impaired Physicians Program and undermine the working relationship among the entities involved.

Thus, Dr. Crabtree alleges that Dr. Dodd made a statement that is unquestionably true, in the course of a legitimate peer review function. Dr. Crabtree alleges that Dr. Dodd undertook these actions with ill motive, as evidenced by the personal conflicts between Dr. Crabtree and Dr. Dodd. However, even assuming personal animosity between Dr. Crabtree and Dr. Dodd, this "will not

16

suffice to allow an action against" one who makes a true statement in the course of a legitimate peer review function. *Scappatura*, 584 P.2d at 1201.

Dr. Crabtree argues that the TMA's refusal to grant him a hearing, as provided by the TMA's Peer Review Procedures Booklet, is evidence that Dr. Dodd's actions were done with malice. Dr. Crabtree's lawsuit, however, does not seek judicial review of the Peer Review Committee's decision to terminate advocacy. Rather, Dr. Crabtree's complaint focuses on whether Dr. Crabtree can obtain monetary damages for the harm allegedly caused by Dr. Dodd's revelation of the loss of advocacy status to State Volunteer. While the denial of a hearing would be relevant in a lawsuit contesting Dr. Crabtree's loss of advocacy status, it is at best marginally relevant to the issue of whether Dr. Dodd's truthful statement to State Volunteer was done with malice and bad faith:

> If plaintiff sought to challenge either the discipline which was imposed or the process by which it was accomplished he had other remedies available to him. Upholding the legislatively sanctioned privileges for confidential reporting of peer evaluations and disciplinary actions does not infringe upon a wrongly disciplined physician's right to appropriate redress through the courts.

*Dorn v. Mendelzon*, 196 Cal. App. 3d 933, 947, 242 Cal. Rptr. 259, 266-67 (1987). The TMA's denial of a hearing is not adequate to show malice.

When Dr. Crabtree refused in November 1991 to sign the TMA aftercare contract submitted to him, he understood that this action would have adverse consequences in proceedings before the Board of Medical Examiners, Cookeville General Hospital, and State Volunteer. He understood that his continued insurance coverage was conditioned on maintaining advocacy status with the Peer Review Committee. In refusing to sign the aftercare contract, Dr. Crabtree did not merely lose his advocacy status, he threw it away. The loss of his malpractice insurance coverage was the inevitable consequence of his own action.

Overall, the evidence presented is insufficient to support a reasonable inference of malice or bad faith in the context of the Tennessee Peer Review Law. "There must be a great deal more evidence than was presented here to overcome the clear intent of the statute to encourage good faith peer review without fear of reprisal by lawsuit." *Scappatura*, 584 P.2d at 1201.

Therefore, Dr. Dodd is protected by statutory peer review immunity under Tennessee Code Annotated § 63-6-219. The trial court's grant of summary judgment in favor of Dr. Dodd is affirmed on this basis. This holding pretermits the remaining issues raised on appeal.

The decision of the trial court is affirmed. Costs are taxed to Appellant, for which execution may issue if necessary.


_____
                                          **HOLLY KIRBY LILLARD, J.**

**CONCUR:**


_____
**W. FRANK CRAWFORD, P. J., W.S.**


_____
**DAVID R. FARMER, J.**

18