[S.F. No. 24881. July 24, 1986.]

CLYDELHO FROMMOETHELYDO, Plaintiff and Respondent, v. FIRE INSURANCE EXCHANGE et al., Defendants and Appellants.

## Counsel

Jerome F. Downs, Greg S. Tolson, Linda J. Lynch, Thornton, Taylor & Downs, Raoul D. Kennedy, Peter W. Davis, James A. Roberts, James C. Martin, Jacqueline M. Jauregui and Crosby, Heafey, Roach & May for Defendants and Appellants.

Louis A. Highman, Lawrence Ball and Leonard Sacks for Plaintiff and Respondent.

## Opinion

**BROUSSARD, J.**—Plaintiff obtained a judgment for $15,271 in general damages, $250,000 for emotional distress, and $1.25 million for punitive damages in this action for misconduct of an insurer in dealing with a claim for stolen property. The principal issue raised is whether the insurer's report to the Bureau of Fraudulent Claims (hereinafter Bureau) was privileged so as to preclude recovery for injuries sustained as a result of a criminal proceeding. We conclude that the report was privileged and that while we affirm the judgment to the extent of the value of the property stolen, $8,871, less the $100 deductible, the judgment should be reversed as to the additional damages. Although the record supports a finding that the insurer breached its duties, the breach did not cause the additional damages—they were incurred due to the report to the Bureau and the criminal proceeding. Accordingly, we affirm the judgment insofar as it awards plaintiff $8,771,

but reverse the judgment insofar as it awards additional damages, permitting plaintiff to seek additional damages suffered, if any, which were not due to the insurer's report.

In August 1978, plaintiff's home was burglarized, and he submitted a claim for $17,185. The insurer ultimately paid $10,784.

In late June 1979, the house was burglarized again. Plaintiff claimed a loss of $8,871, including $3,000 for stereo and video equipment assertedly bought from Matthew's TV and Stereo. Plaintiff attached a pink copy of a bill of sale to his sworn proof of loss. The copy was one page of a five-page form. The date "1/03/79" appeared in handwriting in the upper left-hand corner, but the cash register printout date on the right-hand side had been erased and obliterated. The other four copies of the bill of sale had a cash register printout date of "7/19/79," which was after the second burglary.

A claims examiner and subsequently a private investigator hired by the insurer interviewed employees at Matthew's. The salesman who made the July sale was acquainted with plaintiff because they had worked together at IBM a number of years earlier. The salesman said that plaintiff told him he wanted a backdated receipt because he wanted to take the equipment abroad and avoid custom duties. The salesman consulted the credit manager, and she authorized the backdating. The sales manager who was not a percipient witness to the transaction confirmed that the receipt had been altered. While a search of Matthew's records revealed sales to plaintiff before the first burglary and after the second, no record was found of a sale between the burglaries.[1]

An attorney hired by the insurer set an oral examination for plaintiff for September 8, 1979. On September 7, the insurer submitted a report to the Bureau. At the oral examination plaintiff said he purchased the same or similar equipment on three occasions, once prior to the first burglary, again between the burglaries, and the third after the second burglary. He said that when he made his most recent purchase, he asked the salesman for a duplicate of the receipt of his purchase made earlier in the year and that the salesman gave him the receipt he submitted with his loss claim. Plaintiff left the oral

---

[1] Apparently the claims examiner and the private investigator did not interview the cashier or the credit manager who initialed the sale documents. The latter testified at trial that she remembered the transaction because this was the only backdated sale document she had authorized although she had once authorized delivery of a blank sales slip to a customer who wanted to avoid customs duties. She testified that it was made clear to plaintiff that, although the January date would be written, the sales document would also contain the cash register printout of the true date.

examination in the middle of it. At trial he testified that he left because the questions were hostile and of a personal nature and he was confused.

The insurer's attorney advised plaintiff by letter that the insurer would not act until the sworn statement was completed. The letter also stated that Matthew's personnel had said that the receipt reflected a July purchase rather than a January purchase and urged plaintiff to complete the examination bringing with him any further documentation. This was the first mention to plaintiff that the receipt was defective. He was not advised that a report had been made to the Bureau. When the examination resumed, plaintiff adhered to his version that he had asked for a copy of a receipt of the January purchase and denied that he asked for a backdated receipt for tax purposes. In November 1979, the insurer denied the claim in its entirety on the grounds of lack of verification and fraud.

The Bureau determined to investigate and assigned one of its senior investigators who had handled over 200 insurance fraud cases for the Bureau. He personally spoke to the Matthew's employees. He concluded that it appeared that insurance fraud had occurred in violation of Insurance Code section 556. He requested prosecution, and after the district attorney concluded that charges should be filed, the investigator signed a complaint.

Plaintiff was arrested at the fire station where he worked in March 1980 by the investigator. He continued to maintain that he had purchased the same equipment at Matthew's on three separate occasions. He spent the night in jail and was harassed by guards and other prisoners. In addition, when he returned to work he was harassed by other firemen. He became withdrawn and his marriage suffered ending in separation.

Plaintiff was held to answer at a preliminary hearing where he did not present any evidence. His attorney subsequently convinced the deputy district attorney that the latter could not prove beyond a reasonable doubt that the claim, as opposed to the receipt, was false. The deputy district attorney dismissed the criminal charges on September 8, 1980, the morning of trial. The basis of the dismissal apparently was that plaintiff had witnesses who would testify to seeing large quantities of stereo and video equipment in his house two months prior to the second burglary and that false documentation of a valid claim was not a violation of Insurance Code section 556.[2]

---

[2]Insurance Code section 556 provides: "(a) It is unlawful to: [¶] (1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss under a contract of insurance. . . ."

The insurer was not advised of the existence of the witnesses until after dismissal of the criminal charges. Plaintiff's criminal attorney thereafter offered to compromise the insurance claim by waiving the disputed $3,000, but the insurer rejected the compromise on the ground that a material misrepresentation in a claim justifies rescission of the entire policy. The insurer did not interview the witnesses.[3]

Plaintiff commenced this action against his insurer. The complaint originally asserted breach of the insurance contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraud, and violation of section 790.03 of the Insurance Code. On the morning of trial, plaintiff dismissed the causes of action for breach of the insurance contract and for fraud. At the trial, a document examiner testified that the cash register printout date had been erased from the pink copy along with the cash register printout of certain other figures, and that the cash register tape with carbon paper had then been used to trace back on the pink copy the other figures. The cash register tape was part of the Matthew's records.

The jury found for plaintiff on the causes of action for breach of the duty of good faith and fair dealing, breach of fiduciary duty, and violation of section 790.03. The economic loss damages awarded are equal to the cost of plaintiff's bailbond, $500, the fee charged by counsel in the criminal case, $6,000, and the amount of the original claim, $8,871, less the insurance deductible of $100. The jury also awarded $250,000 for emotional distress, and $1.25 million punitive damages. Substantially all of plaintiff's emotional distress was due to the criminal proceeding.

## DISCUSSION

A covenant of good faith and fair dealing is implied in every insurance contract. (*White* v. *Western Title Insurance Co.* (1985) 40 Cal.3d 870, 885 [221 Cal.Rptr. 509, 710 P.2d 309]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032].) The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject

---

[3]Evidence as to matters occurring after the dismissal of the criminal action and the insurer's rejection of the attorney's settlement have been omitted. While there may have been reprehensible conduct by the insurer after the rejection of the settlement offer, such conduct did not form the basis for the damages awarded in excess of the value of the stolen property. Reference to the subsequent matters is also unnecessary with respect to the award of the value of the stolen property.

to liability in tort. And an insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818-819 [169 Cal.Rptr. 691, 620 P.2d 141].)

In addition an insurer holds itself out as a fiduciary. With the public trust must go private responsibility consonant with the trust, including qualities of decency and humanity inherent in the responsibilities of a fiduciary. (*Id.*, at p. 820.) Insurance Code section 790.03, subdivisions (h)(3) and (h)(5), make it an unfair business practice for an insurer to fail to adopt and implement reasonable standards for the prompt investigation and processing of claims and not to attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

However, these duties to the insured are applied in the light of the insurer's other duties imposed by statute.

Insurance Code section 12992 provides that an insurer "which believes that a fraudulent claim is being made shall, within 60 days after determination by the insurer that the claim appears to be a fraudulent claim, send to the Bureau of Fraudulent Claims, on a form prescribed by the department, the information requested by the form . . . ." The Bureau shall undertake such investigation as it deems necessary, and the Insurance Commissioner, if satisfied that fraud, deceit or intentional misrepresentation has occurred, shall report any such violations of law to the insurer, to the appropriate licensing agency and to the district attorney. If the commissioner is satisfied that fraud, deceit or intentional misrepresentation has not been committed, he shall report to the insurer. The insurer is not required to report to the Bureau if subsequent investigation shows that the claim is not fraudulent or if the insurer has reached agreement with the claimant as to the amount of the claim and does not have reasonable grounds to believe the claim is fraudulent.[4]

---

[4]Section 12992 provides: "(a) Any company licensed to write insurance in this state which believes that a fraudulent claim is being made shall, within 60 days after determination by the insurer that the claim appears to be a fraudulent claim, send to the Bureau of Fraudulent Claims, on a form prescribed by the department, the information requested by the form and such additional information relative to the factual circumstances of the claim and the parties claiming loss or damages as the commissioner may require. The Bureau of Fraudulent Claims shall review each report and undertake such further investigation as it deems necessary and proper to determine the validity of the allegations. Whenever the commissioner is satisfied that fraud, deceit, or intentional misrepresentation of any kind has been committed in the submission of the claim, he shall report any such violations of law to the insurer, to the appropriate licensing agency and the district attorney of the county in which such offenses were committed, as provided by the provisions of Sections 12928 and 12930.

Section 12993 provides that an insurer shall not be subject to civil liability "for libel, slander or any other relevant tort cause of action by virtue of the filing of reports, without malice, or furnishing other information, without malice, required by this article or required by the commissioner under the authority granted in this article."[5]

■ When it reported to the Bureau, the facts known to the insurer provided a reasonable inference of insurance fraud. Matthew's had been unable to find a record of a sale in January 1979; plaintiff had submitted an obviously backdated receipt, the receipt had apparently been altered in order to validate plaintiff's claim, and no other proof of ownership of the stereo and video equipment had been presented.

Compliance with a statutory duty to report and furnish does not provide a basis for tort liability so long as the information is accurate and complete. The evidence is undisputed that the pink copy of the sales document of the July sale was altered to reflect a sale occurring in January, and that the pink copy was submitted by plaintiff in support of a claim of loss occurring in June. It is not claimed that in reporting to the Bureau the insurer omitted any material information in its possession which might have exonerated plaintiff. Even in the presence of malice, a true and complete report to the Bureau is not actionable.

■ When the report transmitted to the Bureau contains false information, section 12993 expressly provides that an insurer in the absence of malice shall not be subject to civil liability "for libel, slander or any other relevant tort cause of action" for furnishing information required by the code section

---

If the commissioner is satisfied that fraud, deceit, or intentional misrepresentation has not been committed, he shall report such determination to the insurer. If prosecution by the district attorney concerned is not begun within 60 days of the receipt of the commissioner's report, the district attorney shall inform the commissioner and the insurer as to the reasons for the lack of prosecution regarding the reported violations.

"(b) This section shall not require an insurer to submit to the bureau the information specified in subdivision (a) in either of the following:

"(1) The insurer's initial investigation indicated a potentially fraudulent claim but which further investigation revealed not to be fraudulent.

"(2) The insurer and the claimant have reached agreement as to the amount of the claim and the insurer does not have reasonable grounds to believe the claim to be fraudulent.

"(c) Nothing contained in this article shall relieve an insurer of its existing obligations to also report suspected violations of law to appropriate local law enforcement agencies.

"(d) Any police, sheriff or other law enforcement agency shall furnish all papers, documents, reports, complaints, or other facts or evidence to the Bureau of Fraudulent Claims, when so requested, and shall otherwise assist and cooperate with the bureau."

[5]Section 12993 provides: "No insurer, or the employees or agents of any insurer, shall be subject to civil liability for libel, slander or any other relevant tort cause of action by virtue of the filing of reports, without malice, or furnishing other information, without malice, required by this article or required by the commissioner under the authority granted in this article."

or the Insurance Commissioner. Libel and slander causes of action are, of course, the traditional remedies for publishing false information. Section 12993 applies only to insurers, and the conditional privilege thereby provided to insurers applies to any action against the insurer premised on misrepresentation made in a report to the Bureau.[6]

Under the evidence, it could be concluded that the insurer transmitted false information to the Bureau. The trier of fact could conclude that plaintiff had purchased the video and stereo equipment between the two burglaries, that he had asked the Matthew's salesman for a receipt of that purchase, that the Matthew's salesman purported to give him such a receipt, and that the Matthew's salesman falsely stated plaintiff asked for a backdated receipt for customs purposes. The fact that the insurer may have accurately reported the salesman's statements does not mean that the insurer may not be held responsible for those statements. When one person repeats another's defamatory statement, he may be held liable for republishing the same libel or slander. (*Gilman* v. *McClatchy* (1896) 111 Cal. 606, 612 [44 P. 241]; *Arditto* v. *Putnam* (1963) 214 Cal.App.2d 633, 639, fn. 2 [29 Cal.Rptr. 700]; Rest. 2d Torts, § 581A, com. e.)

The issue then becomes whether there is evidence of malice on the insurer's part. "Section 48a, subdivision 4(d), of the Civil Code defines 'actual malice' as 'that state of mind arising from hatred or ill will toward the plaintiff; provided, however, that such a state of mind occasioned by a good faith belief on the part of the defendant in the truth of the libelous publication or broadcast at the time it is published or broadcast shall not constitute actual malice.' A California appellate court has recently held that 'The malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations).' (*Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 936 [119 Cal.Rptr. 82], italics in original; see also *White* v. *State of California, supra,* 17 Cal.App.3d 621, 628-629.)" (*Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134 Cal.Rptr. 402, 556 P.2d 764].)

---

[6]The insurer claims that its report is absolutely privileged under Civil Code section 47, subdivision 2 as a communication made in an official proceeding authorized by law and that the only action which can be maintained based on its report is an action for malicious prosecution. (See *Hogen* v. *Valley Hospital* (1983) 147 Cal.App.3d 119, 122-123 [195 Cal.Rptr. 5]; *Stanwyck* v. *Horne* (1983) 146 Cal.App.3d 450, 457-459 [194 Cal.Rptr. 228].) However, if the report was absolutely privileged under section 47, Insurance Code section 12993 providing a conditional privilege for the reports would serve no useful purpose. The special provision granting only a conditional privilege for the reports must prevail over the general provision granting an absolute privilege.

It does not appear that the insurer was aware the Matthew's salesman had lied, that there was any collusion between the salesman and the insurer, or that the insurer had any reason to suspect the salesman was lying apart from plaintiff's assertion that he had asked for a copy of the January sale documents and believed he had received one.

█ Plaintiff asserts that malice is shown because the insurer stood to profit if plaintiff was successfully prosecuted for fraud, the insurer's employee intentionally prepared his report in a manner likely to result in prosecution rather than in being lost in the Bureau's files, the insurer did not interview the cashier or credit manager, the insurer did not interview plaintiff before reporting to the Bureau or advise him of its intent to report to the Bureau, and the insurer did not consult an expert document examiner.

However, we have concluded that these matters are not sufficient to show malice. In almost every case if not every case where an insurer reports a claim believed to be fraudulent to the Bureau, the insurer stands to profit if the insured is successfully prosecuted. If ability to profit warranted a finding of malice, the insurer would be required to guarantee the accuracy of information obtained and to act at its peril whenever it reported information to the Bureau, and the statutory privilege would be meaningless. Accordingly, the potential that the insurer may escape liability on the insured's claim is not sufficient to show malice. Rather, the requirement of malice in the statute must be viewed as a legislative determination that the insurer's pecuniary interest without more does not make the report actionable.

Once an insurer has evidence providing probable cause to believe an insurance fraud has occurred and determines to make a report to the Bureau, it may properly make its report, and the fact that the report is designed to secure prosecution does not show malice so long as the report does not contain known inaccuracies and is not incomplete.

Plaintiff's major argument is that the insurer should have investigated further. Notwithstanding that it had probable cause to believe that an insurance fraud had been committed, plaintiff asserts, the insurer had a duty to its insured to investigate further to determine whether there was evidence that would explain the apparent fraud. In so urging, plaintiff points out that under section 12992 an insurer is not required to report to the Bureau if a subsequent investigation revealed that the insured was not fraudulent or if there is a settlement and the insurer does not believe the claim to be fraudulent. Plaintiff points out that the insurer's implied covenant of good faith and fair dealing, its fiduciary duties to the insured, and its statutory duty to engage in fair business practices all encompass a duty to investigate.

(See, e.g., Ins. Code, § 790.03, subd. (h)(3); *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 817-819.)

Application of the duty to investigate to actions based on a report by an insurer to the Bureau would be in conflict with the privilege established by section 12993 for nonmalicious reports. As we have seen, the privilege applies unless the insurer acts out of hatred or ill will or in reckless disregard of the insured's rights. There is no evidence that the insurer acted out of hatred or ill will or in reckless disregard of the insured's rights. Permitting recovery for an inaccurate report on the basis of a lesser standard—a duty to further investigate based on the implied covenant, fiduciary duty, or the duty to engage in fair practices—would mean that the privilege is illusory. We conclude that when an insured seeks damages on the basis of an insurer's report to the Bureau, the privilege of section 12993 must take precedence over the ordinary duty to investigate. In the instant case, plaintiff has failed to present evidence that the insurer acted maliciously in making its report to the Bureau.

This does not mean that an insured may not recover damages for a failure to investigate in violation of the implied covenant, fiduciary duty or the duty to engage in fair practices. The insured may recover damages for such violations where the recovery is not predicated upon injury due to a report to the Bureau but upon other injuries.

Moreover, there was no breach of the duty to investigate causing injury prior to the report to the Bureau. The credit manager of Matthew's testified in substantial accord with the Matthew's salesman, and thus had the credit manager been interviewed prior to the report, it would have been harmful rather than helpful to plaintiff. The cashier did not testify, and it is mere speculation that the cashier could shed any light favorable to plaintiff on the matter. The document examiner testified that the erasure of the cash register printout date was visible to the naked eye. Although he also stated that the cash register tape was used to replace some of the figures on the pink copy which had apparently been mistakenly erased, this testimony showed that the alteration occurred at Matthew's, and did not show that there was no insurance fraud.

The only further investigation that might have precluded the report to the Bureau is if the insurer had located the witnesses who had seen large amounts of stereo and video equipment in plaintiff's home between the burglaries. The witnesses were obviously known to plaintiff and not the insurer. Plaintiff did not advise the insurer of the existence of the witnesses until after the

criminal charges were dismissed, and the insurer's failure to discover them earlier cannot be viewed as a failure to adequately investigate.

We conclude that the judgment cannot be upheld to the extent that plaintiff was awarded damages for injuries attributable to the report to the Bureau and the subsequent criminal proceeding.

On the other hand, the evidence shows that after the dismissal of the criminal charges the insurer breached its duty to investigate. (*Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 817-819.) In *Egan* the evidence was undisputed that the insurer failed to properly investigate the plaintiff's claim, and we held that the trial court correctly instructed the jury that a breach of the implied covenant of good faith and fair dealing was established. (24 Cal.3d at p. 819.) In the instant case, once the insurer was advised of the existence of witnesses who had observed the equipment in plaintiff's house, it had a duty to fairly investigate to determine whether plaintiff had a valid claim. The evidence is undisputed that the insurer failed to investigate when after dismissal of the criminal charges it learned of the existence of the witnesses. The undisputed evidence establishes a breach of the covenant.

The damages awarded for the cost of the bail bond and the attorney fees in the criminal case were based on the insurer's report to the Bureau. The emotional distress damages are based on evidence relating to the period between plaintiff's arrest and the dismissal of the criminal charges and for injuries received as a result of the insurer's report to the Bureau and the subsequent criminal proceeding. The award of punitive damages may not be upheld since most of the compensatory damages must be set aside. (See *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927-928 [148 Cal.Rptr. 389, 582 P.2d 980].) The judgment must be reversed insofar as it awards the above damages. The damages for economic loss, insofar as they are based on the value of the stolen goods, can be upheld. The record shows that the insurer breached its duty to investigate after it was advised of the existence of plaintiff's witnesses. By awarding damages for economic loss, the jury obviously determined that plaintiff had suffered the loss. In addition, plaintiff should be permitted to seek a further trial to recover other damages, if any, resulting from the insurer's failure to investigate after it learned of plaintiff's witnesses.

The judgment is affirmed insofar as it awards plaintiff $8,771. In all other respects it is reversed. Each side shall bear its costs on appeal.

Bird, C. J., Mosk, J., Reynoso, J., and Warren (Earl), Jr., J.,* concurred.

---

*Judge, Sacramento Municipal Court, assigned by the Chairperson of the Judicial Council.

**GRODIN, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that the evidence in the record is insufficient to demonstrate that the insurer acted with malice in making its report to the Bureau of Fraudulent Claims (Bureau). As the majority notes, the receipt which plaintiff submitted to the insurer in support of his claimed loss contained, on its face, an indication that the relevant date may have been altered, and the insurer's investigation confirmed that the receipt had in fact been backdated. There is no evidence to suggest that the insurer realized when it reported the matter to the Bureau that the insured's claim was actually valid or that it made the report simply to avoid its contractual obligations. On these facts, I agree that Insurance Code section 12993 precludes the insurer from being held liable for any damage plaintiff may have suffered as a result of either the insurer's report to the Bureau or the subsequent criminal proceedings. Since, as the majority points out, the substantial damages awarded by the jury in this case were attributable, at least in large part, to the filing of the report and the manner in which the criminal proceeding against defendant was handled, the bulk of the damage award must be reversed.

Where I part company with the majority, however, is in its conclusion that—despite the above error—the jury's imposition of liability on the insurer for breach of the covenant of good faith and fair dealing should nonetheless be affirmed. (*Ante*, p. 220.) In reaching this conclusion, the majority states that "the evidence shows that after the dismissal of the criminal charges the insurer breached its duty to investigate." (*Ante*, p. 220.) The jury, however, was never asked to determine whether the insurer's "post-dismissal"—or, perhaps more precisely, nonprivileged[1]—conduct, considered alone, constituted a breach of the covenant of good faith and fair dealing. As noted, much of the evidence presented at trial related to the events surrounding the insurer's filing of the reports with the Bureau and the resulting criminal proceeding, and the jury was not instructed that, in determining whether the insurer had violated its duty of good faith and fair dealing, it could not consider the insurer's privileged conduct or the consequences that flowed from such conduct.

Nor do I think that we can properly find on this record that the insurer's nonprivileged conduct constituted a tortious breach of the covenant of good faith and fair dealing *as a matter of law*. Contrary to the majority's intimation, *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141] neither holds nor suggests that an insurer,

---

[1]Although the majority opinion refers to conduct of the insurer which occurred "after the dismissal of the criminal charges," it would appear that the jury—in passing on the breach-of-the-covenant-of-good-faith question—could properly consider both pre and postdismissal conduct of the insurer that was not a part of the activity to which section 12993's privilege attaches.

which discovers, after considerable investigation, that its insured has filed a false proof-of-loss statement, invariably breaches the covenant of good faith and fair dealing simply by failing to undertake further investigation of new evidence belatedly presented by the insured. Although under some circumstances an insurer's failure to pursue additional investigation of an insured's claim might be found to constitute bad faith conduct, it surely would be appropriate in making that determination for the trier of fact to take into account the earlier investigatory efforts of the insurer and the relative culpability of the insured. It is not proper to foreclose or to prejudge that inquiry here.

Thus, I conclude that the judgment should be reversed in its entirety.[2] If plaintiff chooses to pursue the matter, the case should be retried and submitted to the jury under proper legal principles.

Lucas, J., concurred.

Respondent's petition for a rehearing was denied September 25, 1986.

---

[2]Contrary to the majority's suggestion, I do not think we can properly affirm the judgment "insofar as it awards plaintiff $8,771." (*Ante,* p. 220.) As the majority's statement of facts indicates (*ante,* p. 214), at the beginning of trial plaintiff dismissed his breach of contract claim; as a consequence, the jury was not instructed on breach of contract—as contrasted with breach of the covenant of good faith and fair dealing—principles. Thus, if the $8,771 award is to be sustained, it can only be upheld as a proper portion of the damages obtainable for the insurer's breach of the covenant. Because the jury has not yet determined whether the insurer's *nonprivileged* conduct amounted to a breach of the covenant, however, we cannot affirm any damages that were predicated on such a breach.