[No. B187706. Second Dist., Div. Three. Mar. 22, 2007.]

MARY ANN JORDAN, Plaintiff and Appellant, v.
ALLSTATE INSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Jacobs, Jacobs & Rosenberg, Stanley K. Jacobs, Thomas F. Borcher; Law Offices of John F. Gerard and John F. Gerard for Plaintiff and Appellant.

MacGregor & Berthel, Gregory Michael MacGregor, Deborah A. Berthel and Joshua N. Willis for Defendant and Respondent.

## OPINION

**CROSKEY, J.**—Mary Ann Jordan, plaintiff and appellant, seeks reversal of a judgment entered in favor of respondent Allstate Insurance Company (Allstate) on her complaint for breach of contract, breach of the implied covenant of good faith and fair dealing and declaratory relief. The issue presented to us is whether Jordan has a viable claim for breach of the implied covenant; after the trial court granted Allstate's motion for summary adjudication of that issue, Jordan dismissed her other two causes of action so that an appealable judgment could be entered.[1]

While we agree with the trial court and Allstate that the insurer's interpretation of the language of its policy which led to its original denial of Jordan's claim was reasonable, it does not follow that Allstate's resulting claim denial can be justified in the absence of a full, fair and thorough investigation of *all* of the bases of the claim that was presented. Jordan, in her opposition to Allstate's summary adjudication motion, has raised several triable issues of fact with respect to the adequacy of Allstate's investigation of her claim and thus the summary disposition of her bad faith claim was not appropriate. We will therefore reverse and remand for further proceedings.

---

[1] The effect of such dismissal, if the statute of limitations has expired on her contract cause of action, may mean the loss of that claim. Thus, as we explain below, in order to recover in this action against her insurer, Jordan must not only establish coverage but also that Allstate was guilty of bad faith in the handling of her claim.

## *FACTUAL AND PROCEDURAL BACKGROUND*

This is the second time that this case has come before us. Nearly three years ago, in *Jordan v. Allstate Ins. Co.* (2004) 116 Cal.App.4th 1206 [11 Cal.Rptr.3d 169] (*Jordan I*), we reversed a summary judgment in favor of Allstate. In that opinion, we recited the following factual background which is also relevant here.[2]

"In August of 2000, Jordan purchased a Deluxe Plus Homeowner's Policy (No. 037803085) from Allstate that provided coverage for her 70-year-old Santa Monica home. The policy provided 'all-risk' coverage of up to $194,792 (for the dwelling) and $19,479 (other structures).

"As is common in such policies, it was subject to certain exclusions. Particularly relevant to the issues before us, the policy provided that it did *not* cover (1) a loss consisting of or caused by '. . . rust or other corrosion, mold, *wet or dry rot*' (italics added) or (2) a 'loss to [covered] property consisting of or caused by *collapse*.' (Italics added.) There was an *exception* to this 'collapse' exclusion, however, that was set out in a section of the policy headed by the term 'additional coverage.' This section provided that the policy would nevertheless cover:

'a) the *entire* collapse of a covered building structure;

'b) the *entire* collapse of a part of a covered building structure; and

'c) direct physical loss to covered property caused by (a) or (b) above.' (Italics added.)

"This exceptional 'additional coverage' was limited to the collapse of a building structure specified in (a) or (b) that was 'a sudden and accidental direct physical loss caused by one or more of the following: [¶] . . . [¶] b) hidden decay of the building structure; [¶] [and] . . . .' The term 'collapse,' however, did *not* include 'settling, cracking, shrinking, bulging or expansion.' " (*Jordan I, supra,* 116 Cal.App.4th at pp. 1209–1210.)

In early December of 2000, Jordan discovered that a window had fallen out of the wall of her living room and floorboards in the corner of a living room were "giving way." On December 20, Jordan hired Jose Luis DeLaCruz of DeLaCruz Wood Preservation Services to conduct an investigation. He concluded that the damage was caused by a water-conducting fungus known

---

[2] The facts and procedural matters that we recite are taken from *Jordan I*, are undisputed in the record before us or are based on the evidentiary showing made by the parties in support of or in opposition to Allstate's motion for summary adjudication.

as Meruliporia incrassata (Poria). After receiving his report,[3] Jordan submitted a claim to Allstate on December 26, 2000. Allstate retained its own experts to inspect Jordan's property. They came to the same conclusion as DeLaCruz as to the cause of the damage.

On January 19, 2001, Allstate denied Jordan's claim on the ground that coverage was precluded under the exclusion for any loss consisting of or caused by ". . . wet or dry rot." Jordan responded that Poria fungus was not wet or dry rot and asked Allstate to reconsider its decision. Allstate, on February 5, 2001, replied that Jordan's damage had been caused by wet or dry rot and thus the exclusion applied.

Jordan filed this action on August 27, 2001. She claimed that a Poria fungus infestation did not constitute either wet or dry rot and therefore the exclusion relied upon by Allstate did not apply; but even if it did, she was still entitled to coverage under the collapse exception contained in the "additional coverage" section of her policy. Allstate moved for summary judgment which the trial court granted on two grounds: (1) the "wet or dry rot" exclusion included a fungal infestation and (2) the coverage for collapse did not extend to an "imminent collapse" which was all that was reflected in the record.

In *Jordan I*, we reversed after concluding that the policy language relating to the "wet or dry rot" exclusion and the additional coverage provided under the collapse exception were contradictory and confusing, thus creating an ambiguity. We said, "[a]s our discussion of the dictionary definition of 'dry rot' made clear, that term necessarily involves 'decay.' Thus, the use of the term 'dry rot' in the exclusion and the use of the term 'hidden decay,' in the provision for 'additional coverage' lead to a confusing contradiction. Such contradiction creates an ambiguity with respect to coverage involving a claim of collapse. Given our obligation to read the Allstate policy so as to give full effect to *all* of its terms and conditions [citations], we might reconcile this contradiction in one of two ways. First, we could conclude that a collapse due to 'hidden decay' would be covered, but not if such decay was caused by 'wet or dry rot'; or, second, we could conclude that coverage for a collapse due to 'hidden decay' was provided, but *noncollapse* damage caused by 'wet or dry rot' was excluded. Each of these constructions of the policy language

---

[3] As we stated in *Jordan I*, "In his report, DeLaCruz had noted that the Poria fungus was found 'in the subfloor, in the rim joist and in the section of the girder of the side of the dwelling.' He also found it in the jam[b]s and trims above the side window of the living room and that the damage had extended to the wood members in the concealed areas of the wall. With respect to the area of the living room floor that had 'given way,' DeLaCruz warned that '[e]xtreme caution should be exercised during the opening of the floor as this section of the substructure is [*sic*] *imminent* danger of collapse.' (Italics added.)" (*Jordan I, supra,* 116 Cal.App.4th at p. 1210, fn. 2.)

is reasonable. The first is consistent with Allstate's contention that the exclusion for 'wet or dry rot' precludes coverage irrespective of whether there is a basis for coverage under the exception to the collapse exclusion. On the other hand, the second interpretation is advanced by Jordan and supports her claim for coverage under the collapse provisions of the 'additional coverage' section of the policy. Thus, when read in the context of the entire policy, particularly the provision granting coverage for a collapse caused by 'hidden decay,' the effect and application of the exclusion for a loss caused by wet or dry rot is not at all clear." (*Jordan I, supra,* 116 Cal.App.4th at pp. 1219–1220, original italics.)

Applying settled principles of policy construction, we resolved this ambiguity by looking to the insured's objectively reasonable expectations and construed the policy language against Allstate and in favor of Jordan. (*Jordan I, supra,* 116 Cal.App.4th at p. 1220.) This meant that Jordan could demonstrate the existence of coverage for her loss *if* she could show that an "entire collapse" had occurred.[4] Because the record was unclear on this issue, we remanded the matter back to the trial court to give Jordan an opportunity to prove that an *actual* collapse had occurred and had resulted in her claimed damage.

Upon return of the case to the trial court, however, Allstate made a motion for summary judgment, arguing that there was no evidence of such a collapse and thus there could be no coverage. The trial court denied the motion, holding that there were unresolved triable issues of fact on the collapse issue. Allstate then moved for summary adjudication of Jordan's cause of action for bad faith, arguing that since we had, in *Jordan I,* concluded that Allstate's interpretation of its policy had been *reasonable,* even though erroneous, there could be no claim for bad faith arising from its denial of Jordan's claim as a matter of law.

The trial court was persuaded by that argument and granted Allstate's motion.[5] Thereafter, Jordan dismissed her other two causes of action against

---

[4] We held in *Jordan I* that under the policy, the term "entire collapse" meant an *actual* collapse, not an imminent one. (*Jordan I, supra,* 116 Cal.App.4th at p. 1221.)

[5] In its minute order, the trial court described the rationale for its conclusion in the following terms: "Defendant, Allstate Insurance Company's Motion for Summary Adjudication is granted. [Allstate] successfully establishes that its interpretation of the policy was reasonable. See [the appellate opinion in *Jordan I*]. [Jordan] fails to competently dispute the legal argument that the [*Jordan I*] decision renders the coverage position reasonable as a matter of law. [Jordan] fails to raise a triable issue of material fact with respect to alleged violations of the insurance code regulations. [Jordan's] argument that the obligation of good faith and fair dealing continues during the pendency of litigation fails. The facts of White v. Western Title are distinguishable from those in this case, and the Court finds that the contrary authority set forth by Defendant in reply (see the Rutter Guide on Insurance Litigation) is applicable to this

Allstate for breach of contract and declaratory relief. This enabled the court to enter a final judgment in the matter and Jordan then filed this timely appeal.

## CONTENTIONS OF THE PARTIES

Jordan argues that the fact that Allstate's interpretation of its policy was reasonable does not preclude a claim for bad faith arising from its claims-handling activities, particularly its failure to conduct a full, fair and thorough investigation of her claim. Had Allstate done so, she argues it could have determined that a basis for coverage existed under the collapse provisions of the policy. She contends that the evidence and expert opinions that she presented on this issue were sufficient to raise a triable issue of fact and that the trial court's summary resolution of her bad faith cause of action was error.

Allstate disputes each of these arguments and contends that our decision in *Jordan I* is the law of the case and binding on the question of whether Allstate acted reasonably in denying coverage. It contends that the existence of a legitimate dispute about coverage precludes, as a matter of law, any claim for bad faith. Moreover, Allstate argues that Jordan has produced no evidence of an actual collapse which, under *Jordan I*, is a necessary predicate to coverage under the policy; and, without coverage, there can be no viable bad faith claim in any event.

## DISCUSSION

### 1. Standard of Review

We conduct a de novo review of this matter. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 474 [261 Cal.Rptr. 735].) In doing so, we apply the same rules as the trial court was required to apply in deciding Allstate's motion for summary judgment.

As the party moving for summary judgment, Allstate bore an initial burden of production of a prima facie showing that there is no triable issue of material fact in this case and it is entitled to judgment as a matter of law. Only if Allstate carried that burden was Jordan faced with a burden of production of her own—to make a prima facie showing of the existence of a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "A prima facie showing is one that is sufficient to support the position of the party in

---

case. [¶] For the reasons set forth above, [Jordan's] claims for breach of the implied covenant of good faith and fair dealing, punitive damages, and attorneys' fees all fail."

question. [Citation.] No more is called for." (*Id.* at p. 851.) "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. ([Code Civ. Proc.], § 437c, subd. (o)(2).)" (*Id.* at p. 850, italics & fns. omitted.) "[H]ow the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial. [The California Supreme Court has] . . . held to the effect that the placement and quantum of the burden of proof at trial [are] crucial for purposes of summary judgment. [Citation.] . . . Thus, . . . if a defendant moves for summary judgment . . . , he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Id.* at p. 851, fn. omitted, original italics.)

Because a summary judgment denies the adversary party a trial, it should be granted with caution. (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 865 [247 Cal.Rptr. 504].) Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party. The court focuses on issue finding; it does not resolve issues of fact. The court seeks to find contradictions in the evidence, or inferences reasonably deducible from the evidence, which raise a triable issue of material fact. (*Id.* at pp. 865–866.) If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first addressed on appeal. (*Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698].) If, on the other hand, we find that one or more triable issues of material fact exist, then we must reverse the judgment.

### 2. *The Relevant Principles Applicable to Jordan's Bad Faith Claim*

An insurer is said to act in "bad faith" when it not only breaches its policy contract but also breaches its implied covenant to deal fairly and in good faith with its insured. "A covenant of good faith and fair dealing is implied in every insurance contract. [Citations.] The implied promise requires

each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort. And *an insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial.* [Citation.]" (*Frommoethelydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 214–215 [228 Cal.Rptr. 160, 721 P.2d 41], italics added.) Indeed, in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141], the Supreme Court emphasized that, in order to protect the interests of its insured, it was "essential that an insurer *fully* inquire into *possible* bases that *might* support the insured's claim." (*Id.* at p. 819, italics added.)

▮ Before an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*. Where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346–347 [108 Cal.Rptr.2d 776].) Moreover, it must be remembered that "an insurer is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders (if it is such a company) not to dissipate its reserves through the payment of meritless claims. Such a practice inevitably would prejudice the insurance seeking public because of the necessity to increase rates, and would finally drive the insurer out of business. Indeed, analysis of the leading first party cases demonstrates that a rule has never been applied which holds under any circumstances that an insurer which refuses to pay benefits claimed to be due under the policy did so at its own risk. Clearly, both logic and good policy dictate that no such rule ever be applied in first party cases." (*Austero v. National Cas. Co.* (1978) 84 Cal.App.3d 1, 30 [148 Cal.Rptr. 653], disapproved on another ground in *Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 824, fn. 7.)

### 3. *Allstate's Denial of Coverage Based on a Reasonable Interpretation of Its Own Policy Does Not Excuse Its Failure to Investigate Other Possible Bases for Jordan's Claim*

As already indicated, an insurer cannot be held liable for bad faith when it has acted to deny or delay policy benefits *with* proper cause. One of the ways an insurer can negate an insured's claim that it has acted unreasonably or without proper cause is to demonstrate the existence of a "genuine dispute" regarding coverage or the amount or extent of the insured's claimed loss.

██ "It is now settled . . . that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract. [Citation.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th 335, 347.) On the other hand, if the insurer denies benefits unreasonably (i.e., without any reasonable basis for such denial), it may be exposed to the full array of tort remedies, including possible punitive damages. (See *Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 977 [135 Cal.Rptr.2d 718].) "[T]he reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th at p. 347.)

In this case, Allstate argues that since we, in *Jordan I,* had held that its interpretation of the policy exclusion precluding coverage for a loss resulting from "wet or dry rot" was a reasonable one, and Allstate based its denial of coverage on the application of that exclusion, it is established that it acted with proper cause and thus cannot be held liable in bad faith. Jordan claimed that the Poria fungus that had damaged her home was *not* wet or dry rot and therefore the exclusion did not apply. Were that contention the only one asserted by Jordan to support her claim of coverage, Allstate's argument would be more persuasive. Jordan, however, also based her claim on the "additional coverage" provisions in the policy which promised coverage for an "entire collapse" of all or part of her home caused by "hidden decay." As we explained in *Jordan I,* this provision was in conflict with the exclusion relied upon by Allstate and provided a basis of coverage independent of that exclusion. Since this conflict created an ambiguity that we resolved in Jordan's favor, and since the question as to whether an entire collapse had in fact occurred was an unresolved factual issue, we reversed and remanded for resolution of that question.[6] These circumstances raise the issue that is at the heart of Jordan's present argument relating to Allstate's duty to investigate her claim.

As already noted, an insurer owes a duty to its insured to investigate *all* of the possible bases of an insured's claim. The insurer's duty to give as much consideration to the insured's interests as it does to its own obligates it to

---

[6] It is true that the trial court in *Jordan I* had concluded that an "entire collapse had not occurred" but, as we noted in our opinion in that matter, there was not sufficient evidence in the record to support that conclusion and we remanded with directions for the trial court to address and decide the issue. Upon remand, the trial court rejected Allstate's motion for summary judgment, finding that there *were* unresolved triable issues as to whether an "entire collapse" had in fact occurred.

investigate a claim thoroughly. An insurer must fully inquire into the bases for the claim; indeed, it "cannot reasonably and in good faith deny [benefits] to its insured without *thoroughly* investigating the foundation for its denial." (*Egan v. Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 819, italics added.) "An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing." (*Mariscal v. Old Republic Life Ins. Co.* (1996) 42 Cal.App.4th 1617, 1624 [50 Cal.Rptr.2d 224]; see also *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 882 [93 Cal.Rptr.2d 364] [the record "suggests that [the insurer] looked the other way when confronted with facts revealing the possibility of first party coverage, resisting both reasonable interpretation of policy language and a compelling history of negotiation to secure this coverage"]; *Amadeo v. Principal Mut. Life Ins. Co.* (9th Cir. 2002) 290 F.3d 1152, 1163 [even assuming the insurer's interpretation of its policy was not adopted in bad faith, its failure to investigate the facts surrounding the claim was evidence of bad faith].)

■ As we made clear in *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th 335, where an insurer denies coverage but a *reasonable investigation* would have disclosed facts showing the claim was covered, the insurer's failure to investigate breaches its implied covenant. The insurer cannot claim a "genuine dispute" regarding coverage in such cases because, by failing to investigate, it has deprived itself of the ability to make a fair evaluation of the claim. (*Id.* at pp. 348–349.) Thus, although Allstate's interpretation of a policy exclusion was reasonable, it also had a duty to investigate Jordan's coverage claim that was based on the "additional coverage" provisions relating to an "entire collapse," which we held, in *Jordan I,* was also reasonable and consistent with Jordan's objectively reasonable expectations.

We now turn to an examination of the record to see if it supports Jordan's contention that she has raised triable issues of fact with respect to the nature and extent of Allstate's investigation of the collapse basis for her claim.

4. *The Record Demonstrates That Jordan Has Raised Triable Issues of Fact as to Allstate's Investigation*

The record before us reflects that Jordan, in opposition to Allstate's motions for summary judgment presented evidence in the form of declarations, deposition testimony and/or documentary material that reflected the following matters:

1. Despite the recommendation of its own experts and the recommendation of Mr. DeLaCruz (Jordan's fungus expert) that a structural engineer be

retained by Allstate to inspect the property, Allstate failed to do so. Allstate's adjuster stated she simply disregarded the recommendation out of hand.

2. Allstate contended that it did not need to send out a structural engineer because its experts, Pacific Health & Safety (PH&S), did not describe any areas of "collapse" to be further inspected. However, Allstate never asked PH&S to determine whether there had been a collapse. The only request that is documented in the file is a request for PH&S "to confirm poria." Allstate's adjuster, Tina Bulmer, specifically stated in her deposition that she did not hire PH&S to make any recommendations regarding "structural engineering."

3. Despite the fact that internal correspondence about the possibility that the "collapse" coverage might apply to Jordan's loss, Allstate never communicated anything to Jordan about this coverage potential until Jordan's attorney finally received a copy of the policy (which he had been requesting) and noted the collapse provision.

4. Although they apparently recognized that the collapse coverage applied where there was "hidden decay," Allstate's adjusters never made any attempt to inspect the inner walls or subflooring of the Jordan home. PH&S had specifically recommended an inspection by a structural engineer because there had not been any demolition of the relevant areas of the home at the time it completed its inspection.

5. Allstate's claims supervisor, Dick Ray, e-mailed Bulmer on the case stating "the only reason to hire a structural engineer would be to determine if collapse has occurred." Ray further advised her that if she wasn't "certain" that there was collapse, then a structural engineer would be appropriate. Nevertheless, Bulmer never took any further steps to hire a structural engineer until a month before Allstate filed its second summary judgment motion. Only then did Allstate retain an engineer to review photographs that had been in its possession for more than a year.

6. Bulmer stated that she did not hire a structural engineer because Jordan had not provided any proof of actual collapse. Yet, Jordan had not been advised that the policy provided coverage for actual collapse until several months into the claim even though she and/or her attorney had been requesting copies of the policy.

7. Although Jordan, herself, was aware from the outset that parts of her home were collapsing, she was never interviewed by any adjuster for Allstate.

8. Bulmer refused to interview Jordan expert DeLaCruz for the sole stated reason that DeLaCruz had been hired by the insured.

9. Allstate left it completely up to Bulmer to determine if there was collapse, despite the fact that she had no credentials or background for making structural engineering decisions.

10. Bulmer noted in the claim file that Jordan had failed to make a claim for any damages and that was one reason why she had conducted no further investigation. Yet, 17 days before Bulmer documented the file with that comment, she also memorialized that she had received a letter from the insured stating that "damage is now spreading at an alarming pace." Further, in a file memorandum she notes that Jordan had asked what Allstate was going to do to prevent "further damage."

11. Allstate did nothing further to investigate coverage based on the collapse provisions after this court's decision in *Jordan I.* Allstate's claim supervisor stated specifically in a postappeal letter that no further investigation would be conducted. Allstate still did not interview its insured about the collapse issue, even though that was the issue to be resolved upon remand. It was not until Allstate was preparing its second motion for summary judgment that, for the first time, it hired an engineer to review the same photographs that had been reviewed and marked by Jordan's structural engineer, Patrick Huff. Allstate had the *unmarked* photographs in its possession for over a year prior to Huff submitting his marked copies.[7]

█ If found to be true at trial and not countered or satisfactorily explained by Allstate, such facts would constitute evidence sufficient to support the conclusion that Allstate did indeed fail to conduct a full, fair, thorough and timely investigation of Jordan's claim as it related to and relied on the "entire collapse" provisions of the Allstate policy. On the other hand, Allstate may well be able to produce evidence that all or part of Jordan's factual assertions are false, or that Allstate's acts or omissions as claimed by Jordan were justified or reasonable in the circumstances. What is clear, however, is that there are disputed issues of fact that must be presented to a

---

[7] We note, lest there be any confusion on the point upon remand, that the fact that this litigation had commenced did not excuse Allstate from the continuing responsibility to fully investigate Jordan's claim. As the Supreme Court cautioned in *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870 [221 Cal.Rptr. 509, 710 P.2d 309], an insurer's duty of good faith and fair dealing does not evaporate after litigation has commenced. To hold otherwise would effectively "encourage insurers to induce the early filing of suits, and to delay serious investigation and negotiation until after suit was filed when its conduct would be unencumbered by any duty to deal fairly and in good faith. . . . The policy of encouraging prompt investigation and payment of insurance claims would be undermined . . . ." (*Id.* at p. 886; see also *Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 685 [95 Cal.Rptr.2d 583].) To the extent that Allstate in fact failed to fully investigate Jordan's collapse claim, particularly after our decision in *Jordan I,* it could be found to have violated the implied covenant of good faith (see *Frommoethelydo v. Fire Ins. Exchange, supra,* 42 Cal.3d at p. 219) and the fact that this litigation was pending would not excuse such violation.

trier of fact for resolution. The issue of Allstate's bad faith conduct cannot be resolved on summary judgment.

### 5. The Trial Court Did Not Err in Admitting Expert Opinion Relating to Allstate's Failure to Comply with Certain Insurance Statutory and Regulatory Provisions

Over Allstate's objection, the trial court considered the declaration of Peter M. Occhialini, an expert on insurance industry claims settlement practice. In his declaration, submitted by Jordan in opposition to Allstate's motion for summary judgment, Mr. Occhialini expressed the opinion that various actions undertaken by Allstate violated certain provisions of the Unfair Insurance Practices Act (Ins. Code, § 790.03, subd. (h)). He expressed the opinion that Allstate had violated section 790.03, subdivision (h)(1), (3), (5) and (13).[8] In addition, Mr. Occhialini cited to a number of regulations adopted by the Insurance Commissioner to enable the administrative enforcement of section 790.03, subdivision (h), which he claimed, were also violated by Allstate. Such regulations, by their terms, set forth the *minimum* standards for claims resolution. (Cal. Code Regs., tit. 10, § 2695.1, subd. (a)(1).)[9]

Allstate objected to the trial court's consideration of the Occhialini declaration on the ground that Insurance Code section 790.03, subdivision (h) cannot provide the basis for a bad faith action (*Moradi-Shalal v. Fireman's*

---

[8] Insurance Code section 790.03, subdivision (h) prohibits "unfair claims settlement practices" by insurers if knowingly committed or performed with such frequency as to indicate a general business practice. The relevant provisions of that section provide:

"(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue. [¶] . . . [¶]

"(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies. [¶] . . . [¶]

"(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear. [¶] . . . [¶]

"(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement."

[9] The regulations that Jordan claims were violated by Allstate's actions were California Code of Regulations, title 10, sections 2695.1, subdivision (a) (violations of the regulations "either knowingly committed on a single occasion, or performed with such frequency as to indicate a general business practice, are considered to be unfair claims settlement practices . . ."), 2695.4, subdivision (a) ("Every insurer shall disclose to a first party claimant . . . all benefits, coverage, time limits or other provisions of any insurance policy issued by that insurer that may apply to the claim presented by the claimant."), 2695.6, subdivision (b)(2)(A) (requires that a copy of the regulations be included in the insurer's claim manual), and 2695.7, subdivision (b)(1) (mandates that a claim denial be in writing and "shall provide to the claimant a statement listing all bases for such rejection or denial and the factual and legal bases for each reason given for such rejection or denial which is then within the insurer's knowledge").

*Fund Ins. Companies* (1988) 46 Cal.3d 287, 304–305 [250 Cal.Rptr. 116, 758 P.2d 58]) and any such violations are matters to be addressed by the Insurance Commissioner. (*R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 352 [44 Cal.Rptr.3d 426].) Allstate did not counter the Occhialini declaration, but objected on the ground that it was inadmissible for the reasons stated above. The trial court overruled that objection.

■ We agree with the trial court. Jordan was not seeking to recover on a claim based on a violation of Insurance Code section 790.03, subdivision (h). Rather, her claim was based on a claim of common law bad faith arising from Allstate's breach of the implied covenant of good faith and fair dealing which she is entitled to pursue. (See *Moradi-Shalal v. Fireman's Fund Ins. Companies, supra,* 46 Cal.3d at pp. 304–305.) Jordan's reliance upon the Occhialini declaration was for the purpose of providing *evidence* supporting her contention that Allstate had breached the implied covenant by its actions. This is a *proper* use of evidence of an insurer's violations of the statute and the corresponding regulations. (See *Rattan v. United Services Automobile Assn.* (2000) 84 Cal.App.4th 715, 724 [101 Cal.Rptr.2d 6].)

### 6. *Jordan's Only Remaining Claim Is for Bad Faith*

As we will reverse this case and remand it for a trial of the contested issues, it is important to make clear that in order for Jordan to recover on her remaining claim of bad faith, it will be necessary for her to first establish a basis for coverage. Indeed, this was the whole point of our remand in *Jordan I.* Her coverage claim rests upon the proposition that there was an "entire collapse" of all or a part of her home. This claim is disputed by Allstate. Before Jordan can successfully assert her claim for damages arising from Allstate's alleged bad faith claims-handling activities, she must first demonstrate that there is in fact coverage under the policy.[10] An insurer's failure to investigate, upon which Jordan's claim of bad faith entirely rests, is *not* separately actionable if there is no coverage. If there is no coverage, then any failure by Allstate to properly investigate would not have caused Jordan any damage. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1151 [271 Cal.Rptr. 246].)

If Jordan proves that an "entire collapse" (as that term has been construed in *Jordan I, supra,* 116 Cal.App.4th at pp. 1221–1222) has occurred, then in order to recover any damages at all, she will next have to prove that Allstate acted in bad faith. It appears that she has abandoned her claim for breach of

---

[10] The trial court may want to consider a bifurcation of this predicate issue.

contract and therefore the establishment of coverage under the policy is a necessary but not a sufficient basis for recovery against Allstate. If she establishes her bad faith claim, then she may be entitled to recover, in addition to any unpaid policy benefits found to be due to her, certain extracontractual tort remedies according to proof. These would include emotional distress damages, attorney's fees and punitive damages.

■ In first party cases, such as this one, the insured may seek damages for emotional distress resulting from the insurance company's unreasonable withholding of policy benefits and any abusive or coercive conduct in so doing. (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43–44 [86 Cal.Rptr.2d 855, 980 P.2d 407] ["In the insurance policy setting, an insured may recover damages not otherwise available in a contract action, such as emotional distress damages resulting from the insurer's bad faith conduct"].)

■ Normally, each party to a civil action must bear his or her own legal fees (Code Civ. Proc., § 1021). However, fees reasonably incurred by an insured to compel payment of benefits due under an insurance policy, as distinguished from fees attributable to proving the insurer's bad faith, are recoverable as damages in a bad faith action against the insurer. (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 [210 Cal.Rptr. 211, 693 P.2d 796]; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 806 [16 Cal.Rptr.3d 374, 94 P.3d 513].) The insured is entitled to recover all policy benefits unreasonably withheld " 'undiminished by the expenses incurred in retaining an attorney to recover under the policy.' " (*Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1258 [45 Cal.Rptr.3d 362, 137 P.3d 192].)

In order to recover such *Brandt* fees, however, the insured is required to plead and prove (1) the amount to which the insured was entitled to recover under the policy, (2) that the insurer withheld payment unreasonably or without proper cause, (3) the amount that the insured paid or incurred in legal fees and expenses in establishing the insured's right to contract benefits[11] and (4) the reasonableness of the fees and expenses so incurred. The important caveat to this award of fees, which we emphasize, is that they "may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract." (*Brandt v. Superior Court, supra,* 37 Cal.3d at p. 819.) Of course, in a case like the one before us, there may

---

[11] This burden on Jordan may well provide an additional justification for the bifurcation and separate trial of the coverage issue upon remand.

be some unavoidable intertwining or overlap of the contract[12] and bad faith issues; in such event, a fair and equitable apportionment would be appropriate.[13]

 Finally, Jordan may be entitled to recover punitive damages if she can prove that Allstate not only denied or delayed the payment of policy benefits unreasonably or without proper cause, but, in doing so, was guilty of malice, oppression or fraud. (*Moradi-Shalal v. Fireman's Fund Ins. Companies, supra*, 46 Cal.3d at p. 305.) The acts constituting such malice, oppression or fraud must be proven *by clear and convincing evidence*. (Civ. Code, § 3294, subd. (a).) In other words, it will not be enough to show, by a preponderance of the evidence, that Allstate had engaged in bad faith claims-handling practices. (*Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 328 [5 Cal.Rptr.2d 594].) Jordan, in order to recover punitive damages, must also demonstrate by clear and convincing evidence that Allstate acted with malice, oppression or fraud as these terms are used in Civil Code section 3294, subdivision (a) and have been construed and applied in relevant case law. (*Mock*, at p. 328; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 13:310 et seq.)

While it is not obvious from the record before us that such clear and convincing evidence exists, we will not foreclose Jordan from an opportunity to put on evidence of Allstate's malice, oppression or fraud. In deciding whether this issue should go to the jury, however, the trial court should view the evidence presented by Jordan through the prism of the higher standard of proof that is imposed by the statute. (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, supra*, 78 Cal.App.4th at pp. 891–892; *Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 482 [21 Cal.Rptr.2d 338].)

---

[12] For example, the contract issues might involve such matters as (1) the proper construction and interpretation of relevant policy provisions, (2) the existence of coverage under the policy, (3) the amount of property damage sustained by Jordan and (4) Allstate's failure to timely pay promised benefits. It is true, however, that some or all of these issues might also be relevant to the claim of bad faith.

[13] In *Cassim v. Allstate Ins. Co., supra*, 33 Cal.4th 780, the Supreme Court described an appropriate method of apportionment when the insured's attorney was working on a contingency: "To determine the percentage of the legal fees attributable to the contract recovery, the trial court should determine the total number of hours an attorney spent on the case and then determine how many hours were spent working exclusively on the contract recovery. Hours spent working on issues jointly related to both the tort and contract should be apportioned, *with some hours assigned to the contract and some to the tort*. This latter figure, added to the hours spent on the contract alone, when divided by the total number of hours worked, should provide the appropriate percentage." (*Id.* at p. 812, italics added.) The apportionment protocol described in *Cassim* may or may not be relevant in this matter. If attorney's fees incurred by Jordan attributable to her efforts to obtain a contract recovery were based on hourly billings from her attorney, then apportionment may be a simple matter of the proper allocation of already designated legal work and the billing therefore.

## *DISPOSITION*

The judgment is reversed and the matter is remanded for further proceedings consistent with the views expressed herein. Jordan shall recover her costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied April 20, 2007, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied June 27, 2007, S152350. Chin, J., did not participate therein.